IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PUBLIC INTEREST LEGAL FOUNDATION,
INC.,

                    Plaintiff,

        v.

MEAGAN WOLFE, in her official capacity as
Administrator of the Wisconsin Elections
Commission,

                    Defendant.

Civil Action No. 24-cv-285-jdp

**BRIEF OF THE UNITED STATES ON THE CONSTITUTIONALITY OF SECTION 4(b)(2) OF THE NATIONAL VOTER REGISTRATION ACT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD ........................................................................................................ 3

STATUTORY BACKGROUND ........................................................................................ 3

ARGUMENT ..................................................................................................................... 6

I.      PILF Lacks Standing to Bring an Equal Sovereignty Challenge to the NVRA Because PILF Has No Individual Interest in the Equal Sovereignty Rights of the States. ............... 7

     A.      PILF Does Not Have Third-Party Standing to Bring its Equal Sovereignty Argument. ........................................................................................................ 8

     B.      PILF Has No Individual Interest in the Equal Sovereignty of the States. ............. 9

II.      Section 4(b)(2) Is a Valid Exercise of Congress's Power Under the Elections Clause.... 12

III.      *Shelby County*'s Equal Sovereignty Principle Does Not Apply to the NVRA. ............... 14

     A.      Courts Have Declined to Apply *Shelby County*'s Equal Sovereignty Principle to Article I Legislation. ............................................................................................ 16

     B.      *Shelby County*'s Equal Sovereignty Principle is Inapplicable to Elections Clause Legislation Like the NVRA. ................................................................................. 17

IV.      Section 4(b)(2) Does Not Raise Equal Sovereignty Concerns. ........................................ 20

     A.      The NVRA Affords Equal Treatment to the States. ............................................. 20

     B.      Section 4(b)(2) Is Related to the Problems Targeted by the NVRA.................... 21

     C.      Current Conditions Support Section 4(b)(2)........................................................ 24

V.      This Court Need Not Consider Congress's Enforcement Authority Under the Reconstruction Amendments, which Provide Independent Authority for the Act. .......... 28

CONCLUSION.................................................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987).................................................................................. 7

*Allen v. Milligan,*
  599 U.S. 1 (2023)..................................................................................... 29

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
  570 U.S. 1 (2013)............................................................................... passim

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................................................. 3

*Ass'n of Cmty. Orgs. for Reform Now v. Edgar,*
  56 F.3d 791 (7th Cir. 1995) .............................................................. passim

*Ass'n of Cmty. Orgs. for Reform Now v. Edgar,*
  880 F. Supp. 1215 (N.D. Ill. 1995) ...................................... 2, 28, 29, 30

*Ass'n of Cmty. Orgs. for Reform Now v. Miller,*
  129 F.3d 833 (6th Cir. 1997) ................................................. 3, 9, 14, 28

*Ass'n of Cmty. Orgs. for Reform Now v. Miller,*
  912 F. Supp. 976 (W.D. Mich. 1995) .................................................... 29

*Ass'n of Cmty. Orgs. for Reform Now v. Ridge,*
  No. Civ. A. 94-7671, 1995 WL 136913 (E.D. Pa. Mar. 30, 1995)......................... 14

*Bond v. United States,*
  564 U.S. 211 (2011)......................................................................... 7, 10, 11

*Briscoe v. Bell,*
  432 U.S. 404 (1977)................................................................................. 21

*Buckley v. Valeo,*
  424 U.S. 1 (1976)..................................................................................... 12

*Burger v. Cnty. of Macon,*
  942 F.3d 372 (7th Cir. 2019) ................................................................... 3

*Burroughs v. United States,*
  290 U.S. 534 (1934)................................................................................ 12

*City of Boerne v. Flores,*
  521 U.S. 507 (1997).................................................................... 2, 29, 30

*Condon v. Reno,*
   913 F. Supp. 946 (D.S.C. 1995) ................................................................. 4, 14, 29

*Ex parte Siebold,*
   100 U.S. 371 (1880) ................................................................................................ 13

*Ex parte Yarbrough,*
   110 U.S. 651 (1883) ................................................................................................ 12

*FCC v. Beach Comm'ns,*
   508 U.S. 307 (1993) ................................................................................................ 25

*FEC v. Akins,*
   524 U.S. 11 (1998) .................................................................................................. 10

*Fish v. Kobach,*
   840 F.3d 710 (10th Cir. 2016) ............................................................................... 13

*Foster v. Love,*
   522 U.S. 67 (1997) ...................................................................................... 13, 14, 19

*Gillespie v. City of Indianapolis,*
   185 F.3d 693 (7th Cir. 1999) ...................................................................... 7, 10, 11

*Greater Birmingham Ministries v. Sec'y of State,*
   105 F.4th 1324 (11th Cir. 2024) ........................................................................... 27

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ................................................................................................ 13

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ................................................................................................ 17

*Herron v. Governor of Pa.,*
   564 F. App'x 647 (3d Cir. 2014) ........................................................................... 17

*Hodak v. City of St. Peters,*
   535 F.3d 899 (8th Cir. 2008) ................................................................................... 9

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013) .................................................................................................. 8

*Ill. Liberty PAC v. Madigan,*
   904 F.3d 463 (7th Cir. 2018) ................................................................................... 3

*Johnson v. U.S. Off. of Pers. Mgmt.,*
   783 F.3d 655 (7th Cir. 2015) ................................................................................... 7

*Kobach v. EAC,*
    772 F.3d 1183 (10th Cir. 2014) ........................................................ 19

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ........................................................ 1, 7, 8, 9

*League of Women Voters of Ind., Inc. v. Sullivan,*
    5 F.4th 714 (7th Cir. 2021) ........................................................ 13

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................ 7

*Massey v. Wheeler,*
    221 F.3d 1030 (7th Cir. 2000) ........................................................ 8

*Mayhew v. Burwell,*
    772 F.3d 80 (1st Cir. 2014) ........................................................ 1, 16, 20, 27

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ........................................................ 1, 28

*NCAA v. Governor of N.J.,*
    730 F.3d 208 (3d Cir. 2013) ........................................................ 16, 23, 27

*Neitzke v. Williams,*
    490 U.S. 319 (1989) ........................................................ 3

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................ 11

*New York v. Yellen,*
    15 F.4th 569 (2d Cir. 2021) ........................................................ 16

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) ........................................................ 27

*Nw. Austin Mun. Utility Dist. No. One v. Holder,*
    557 U.S. 193 (2009) ........................................................ 21, 23, 27, 28

*Ohio v. EPA,*
    98 F.4th 288 (D.C. Cir. 2024) ........................................................ passim

*Pennsylvania v. Wheeling & Belmont Bridge Co.,*
    59 U.S. 421 (1855) ........................................................ 18

*Powers v. Ohio,*
    499 U.S. 400 (1991) ........................................................ 7, 8

*Project Vote / Voting for Am., Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ............................................................. 22

*Pub. Int. Legal Found. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) ................................................................ 23

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) ............................................................................. 9

*Shelby County v. Holder*,
    570 U.S. 529 (2013) ................................................................... passim

*Shimer v. Washington*,
    100 F.3d 506 (7th Cir. 1996) ............................................................. 8

*Siegel v. Fitzgerald*,
    596 U.S. 464 (2022) ......................................................................... 18

*Smiley v. Holm*,
    285 U.S. 355 (1932) ................................................................... 13, 18

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ................................................................... 21, 29

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 799 (1995) ......................................................................... 19

*United States v. Diggins*,
    36 F. 4th 302 (1st Cir. 2022) ........................................................... 15

*United States v. Focia*,
    No. 2:15-cr-17, 2015 WL 3672161 (M.D. Ala. June 12, 2015) ............... 17

*United States v. Metcalf*,
    881 F.3d 641 (8th Cir. 2018) ........................................................... 16

*United States v. Ptasynski*,
    462 U.S. 74 (1983) ........................................................................... 18

*Virginia v. United States*,
    No. 3:94-cv-357, 1995 WL 928433 (E.D. Va. Oct. 18, 1995) ............... 14

*Voting Rights Coal. v. Wilson*,
    60 F.3d 1411 (9th Cir. 1995) ............................................. 3, 9, 14, 28

*Warth v. Seldin*,
    422 U.S. 490 (1975) ....................................................................... 7, 9

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001) ................................................................. 23

*Young v. Fordice*,
   520 U.S. 273 (1997) ................................................................. 3

**Constitutional Provisions**

U.S. Const. amend. XV ................................................................. 17

U.S. Const. art. I ................................................................. 17, 18

U.S. Const. art. I, § 4, cl. 1 (Elections Clause) ................................ passim

U.S. Const. art. I, § 8, cl. 18 (Necessary and Proper Clause) ..................... 17

**Federal Statutes**

28 U.S.C. § 2403 ................................................................. 2

52 U.S.C. § 10302 ................................................................. 27

52 U.S.C. § 10303 ................................................................. 27

52 U.S.C. § 20501 ................................................................. passim

52 U.S.C. § 20503 ................................................................. passim

52 U.S.C. § 20504 ................................................................. 4

52 U.S.C. § 20505 ................................................................. 4

52 U.S.C. § 20506 ................................................................. 4

52 U.S.C. § 20507 ................................................................. 2, 4, 22, 23

52 U.S.C. § 20701 ................................................................. 23

52 U.S.C. § 20703 ................................................................. 23

52 U.S.C. § 20901 ................................................................. 26

52 U.S.C. § 21082 ................................................................. 26

52 U.S.C. § 21083 ................................................................. 27

Balanced Budget Downpayment Act, Pub. L. No. 104-99, 110 Stat. 37 (1996) .......... 6

Continuing Appropriation (Seventh), Pub. L. No. 104-91, 110 Stat. 7 (1996) ........ 6

National Voter Registration Act, Pub. L. No. 103-31, 107 Stat. 77 (1993).............................. 3, 14

**State Statutes**

10 Ill. Comp. Stat. 5/5-50.................................................................................... 25

17 Vt. Stat. § 2144(b)........................................................................................ 25

1994 Idaho Laws Ch. 67 § 5 (H.B. 603)........................................................... 14, 21

1994 New Hampshire Laws Ch. 154 (H.B. 1506) ........................................ 14, 20, 21

Cal. Elec. Code § 2170 ...................................................................................... 25

D.C. Code § 1-1001.07 ...................................................................................... 25

Haw. Rev. Stat. § 11-15.2 .................................................................................. 25

Idaho Code § 34-408A ................................................................................. 14, 25

Iowa Code § 48A.7A .......................................................................................... 25

Md. Code, Elec. Law § 3-305 ............................................................................. 25

Md. Code, Elec. Law § 3-306 ............................................................................. 25

Minn. Stat. § 201.061 ........................................................................................ 25

N.H. Rev. Stat. § 654:7-a ............................................................................ 14, 25

Nev. Rev. Stat. § 293.5842 ................................................................................ 25

Nev. Rev. Stat. § 293.5847 ................................................................................ 25

Utah Code § 20A-2-207 ..................................................................................... 25

Va. Code § 24.2-420.1 ....................................................................................... 25

Wis. Stat. § 6.55 ............................................................................................... 25

Wy. Stat. § 22-3-104 ......................................................................................... 25

**Legislative History**

139 Cong. Rec. 9632 (1993).......................................................................... 6, 25

141 Cong. Rec. 27071 (1995)..................................................................... 6, 21, 26

H.R. Conf. Rep. No. 104-378 (1995).................................................................... 6

H.R. Rep. No. 103-9 (1993) ............................................................................... passim

S. Rep. No. 103-6 (1993) .................................................................................. passim

**Other Authorities**

2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*
(Jonathan Elliot ed., 2d ed. 1836), https://perma.cc/6M66-TP8G ........................................... 18

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1966),
https://perma.cc/6AQB-6AUW ............................................................................... 18

3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*
(Jonathan Elliot ed., 2d ed. 1836), https://perma.cc/CX9V-XGP9........................................... 18

FEC, *Implementing the National Voter Registration Act of 1993: Requirements, Issues,
Approaches, and Examples* (Jan. 1, 1994), https://perma.cc/SGA9-AP8V ........................... 26

Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (1996)
............................................................................................................................... 18

Pauline Maier, *Ratification: The People Debate the Constitution, 1787-1788* (2010) ............... 18

*The Federalist* No. 59 (Clinton Rossiter ed. 2003)...................................................... 18

U.S. Dep't of Justice, *Jurisdictions Previously Covered by Section 5*,
https://perma.cc/W5M7-6MVU................................................................................... 24

U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers*,
https://perma.cc/UXM4-CQ2X................................................................................... 5

## INTRODUCTION

The United States intervened in this action to defend the constitutionality of the National Voter Registration Act of 1993 (NVRA or the Act), including Section 4(b)(2), 52 U.S.C. § 20503(b)(2).  The NVRA established "a complex superstructure of federal regulation atop state voter-registration systems."  *Arizona v. Inter Tribal Council of Ariz., Inc.* (*ITCA*), 570 U.S. 1, 5 (2013).  Section 4(b)(2) of the Act allowed states to receive an exemption from NVRA requirements by authorizing Election Day registration at the polling place by a statutory deadline and maintaining this procedure thereafter.  *See* 52 U.S.C. § 20503(b)(2).

The NVRA is a valid exercise of Congress's plenary authority under Article I of the Constitution, specifically the Elections Clause, U.S. Const. art. I, § 4, cl. 1.  *See, e.g.*, *Ass'n of Cmty. Orgs. for Reform Now v. Edgar* (*Edgar II*), 56 F.3d 791, 792-96 (7th Cir. 1995).  Plaintiff Public Interest Legal Foundation (PILF) lacks third-party standing to assert the state interests underpinning its equal sovereignty challenge to Section 4(b)(2) of the Act.  *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).  In any case, the equal sovereignty principle articulated in *Shelby County v. Holder*, 570 U.S. 529 (2013), does not extend beyond the unique context of Voting Rights Act (VRA) preclearance, let alone apply to Article I legislation like the NVRA.  *See, e.g.*, *Mayhew v. Burwell*, 772 F.3d 80, 93-97 (1st Cir. 2014).  Even if equal sovereignty concerns applied to Elections Clause legislation—and they do not—Section 4(b)(2) would meet the rational design test applied in *Shelby County*, 570 U.S. at 550-53.  Because the Elections Clause provides an independent and sufficient constitutional foundation for the NVRA, this Court need not address whether the NVRA is also a proper exercise of Congress's authority under the Fourteenth and Fifteenth Amendments.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 561, 574-75 (2012).  In any case, the Fourteenth and Fifteenth

Amendments provide a second valid source of authority for the Act. *See, e.g.*, *Ass'n of Cmty. Orgs. for Reform Now v. Edgar* (*Edgar I*), 880 F. Supp. 1215, 1221-22 (N.D. Ill. 1995), *aff'd as modified*, 56 F.3d 791 (7th Cir. 1995).

## PROCEDURAL BACKGROUND

Public Interest Legal Foundation (PILF), a Virginia-based nonprofit, brought suit against Meagan Wolfe, Administrator of the Wisconsin Elections Commission, demanding disclosure of voter registration materials pursuant to Section 8(i) of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(i). *See* Compl. ¶¶ 148-178, ECF No. 1. However, pursuant to Section 4(b)(2) of the NVRA, 52 U.S.C. § 20503(b)(2), the Act does not apply to Wisconsin. Thus, PILF seeks a declaration that Section 4(b)(2) is unconstitutional as applied to Section 8(i) and Wisconsin, to clear the way for Section 8(i) relief against Administrator Wolfe. *See* Compl. at 28-29. Specifically, PILF alleges that Section 4(b)(2) is unconstitutional under the equal sovereignty principle articulated in *Shelby County*, 570 U.S. 529 (2013), and the congruence and proportionality requirement discussed in *City of Boerne v. Flores*, 521 U.S. 507 (1997). Compl. ¶¶ 1, 50-83.[1]

Administrator Wolfe moved to dismiss for failure to state a claim. Mot. to Dismiss, ECF No. 14; *see also* Wis. Mem., ECF No. 15. PILF opposed that motion, PILF Opp'n, ECF No. 16, and Administrator Wolfe filed a reply, Wis. Reply, ECF No. 19. On June 27, PILF filed a notice of constitutional question pursuant to Rule 5.1 of the Federal Rules of Civil Procedure. Rule 5.1 Notice, ECF No. 17. On August 26, 2024, the United States filed a Notice of Intervention pursuant to 28 U.S.C. § 2403(a). U.S. Notice of Intervention, ECF No. 22; *see also* Fed. R. Civ.

---

[1] PILF has also brought a parallel challenge to Section 4(b)(2) against Minnesota Secretary of State Steve Simon. *See Pub. Interest Legal Found. v. Simon*, No. 0:24-cv-1561 (D. Minn. filed Apr. 30, 2024).

P. 5.1(b).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted).  However, courts "are not bound to accept legal conclusions as true." *Burger v. Cnty. of Macon*, 942 F.3d 372, 374 (7th Cir. 2019).  Thus, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989); *see also, e.g.*, *Ill. Liberty PAC v. Madigan*, 904 F.3d 463, 471 (7th Cir. 2018) (affirming dismissal of complaint that failed to articulate a viable legal theory).

## STATUTORY BACKGROUND

On May 20, 1993, President William Clinton signed the NVRA into law.  *See* Pub. L. No. 103-31, 107 Stat. 77 (codified at 52 U.S.C. §§ 20501-11).  The NVRA went into effect for most states on January 1, 1995, although the Act made allowances not relevant here for states whose constitutions had to be amended to permit compliance.  *See id.* § 13, 107 Stat. at 89.  Several states challenged the NVRA's constitutionality.  None succeeded.  *See, e.g.*, *Edgar II*, 56 F.3d at 792-96; *Ass'n of Cmty. Orgs. for Reform Now v. Miller* (*Miller II*), 129 F.3d 833, 836-37 (6th Cir. 1997); *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1413-15 (9th Cir. 1995).

The NVRA "requires States to provide simplified systems for registering to vote in federal elections" and "imposes requirements about just when, and how, States may remove people from the federal voter rolls." *Young v. Fordice*, 520 U.S. 273, 275 (1997) (emphasis omitted).  Section 4(a) lists "general" statutory requirements: states must establish procedures for voter registration for federal office with driver's license applications, by mail application, and at

designated voter registration agencies.  52 U.S.C. § 20503(a); *see also id.* §§ 20504-06.

Section 8 regulates voter registration list maintenance, *see id.* § 20507, and Section 8(i)

specifically requires states to make "records concerning the implementation of programs and

activities conducted for the purpose of ensuring the accuracy and currency of official lists of

eligible voters" publicly available, subject to limited exceptions, *id.* § 20507(i).  In passing the

NVRA, Congress primarily relied on its authority under the Elections Clause, U.S. Const. art. I,

§ 4, cl. 1.  *See* S. Rep. No. 103-6, at 3 (1993) (Senate Report).

      Congress passed the NVRA to increase voter registration among eligible citizens, protect

electoral integrity, and ensure administration of accurate and current voter registration rolls, all

while enabling "governments to implement this chapter in a manner that enhances the

participation of eligible citizens as voters in elections for Federal office," 52 U.S.C.

§ 20501(b)(2).  Congress "found that low voter registration turnout in federal elections poses

'potential serious problems in our democratic society,'" and sought "to remove the obstructive

aspects of registration, by making registration as convenient as receiving other services from

government." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995) (citation omitted).

Congress therefore debated whether to require procedures enabling "registration on the day of

election," which was "[t]he most controversial method of registration considered."  H.R. Rep.

No. 103-9, at 4 (1993) (House Report).  The Committee on House Administration, which first

considered the bill, "concluded that while the concept of 'same day' registration might be

desirable it would not be feasible to mandate such a procedure as a national standard until the

number of unregistered citizens had been substantially reduced and procedures for verification

and vote tabulation clarified." *Id.*  Congress therefore required states to register voters only until

30 days before a federal election.  *See* 52 U.S.C. § 20507(a)(1).

Section 4(b) of the NVRA, entitled "Nonapplicability to certain States," excludes two sets of states from its new registration requirements. *Id.* § 20503(b). Section 4(b)(1) excludes from the NVRA any "State in which, under law that is in effect continuously on and after August 1, 1994, there is no voter registration requirement for any voter in the State with respect to an election for Federal office." *Id.* § 20503(b)(1). This describes only North Dakota. *See* U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers*, https://perma.cc/UXM4-CQ2X.

Section 4(b)(2), which is directly at issue here, exempts any "State in which . . . all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office" (Polling Place Election Day Registration or Polling Place EDR). 52 U.S.C. § 20503(b)(2). A state must have allowed for Polling Place EDR "under law that is in effect continuously on and after August 1, 1994, or that was enacted on or prior to August 1, 1994, and by its terms is to come into effect upon the enactment of [the NVRA], so long as that law remains in effect." *Id.* Thus, states in this second category must have provided for Polling Place EDR by the time the NVRA went into effect and can later become subject to the NVRA if they eliminate Polling Place EDR. This category describes Wisconsin, as well as Idaho, Minnesota, New Hampshire, and Wyoming. *See NVRA: Questions and Answers*, *supra*. Congress believed that "States which have implemented one or both of these exceptions have lessened the impediments to registration" in a manner "which goes significantly beyond the requirements of the bill." Senate Report at 22-23; *accord* House Report at 6.

This did not mean, however, that Congress wished to incentivize states to adopt Polling Place EDR once the NVRA became law. While the House version of the NVRA included an open-ended exemption for states that eliminated voter registration or adopted Polling Place EDR

in the future, the Senate insisted on adding a deadline to this provision in conference.  139 Cong.

Rec. 9632 (1993) (statement of Sen. McConnell).  The senators did so to prevent Section 4(b)(2)

from providing such a strong incentive to avoid federal regulation that it could become "a

backdoor means of forcing States into adopting election day registration," while still

"grandfathering in the . . . States that would have qualified for the exemption prior to March 11,

1993," for which there was no similar coercion concern.  *Id*.  In 1996, Congress extended the

deadline to August 1, 1994—15 months after the statute's original date of passage but 5 months

before its effective date—to grandfather in two additional states that had implemented Polling

Place EDR in the interim.  Pub. L. No. 104-91, §101(a), 110 Stat. 7, 10-13 (1996), *as amended*

Pub. L. No. 104-99, § 211, 110 Stat. 37-38 (1996) (enacting conference report containing

deadline extension); *see also* H.R. Conf. Rep. No. 104-378, at 24 (1995); 141 Cong. Rec. 27071-

72 (1995) (statement of Sen. Ford) (recounting history of original deadline's adoption in

unsuccessful effort to oppose extending the deadline).

## ARGUMENT

PILF's constitutional attacks fail.  To start, PILF has neither third-party standing nor the

individual interest necessary to press its equal sovereignty argument.  But even if PILF could

press that argument, the equal sovereignty principle does not apply to Elections Clause

legislation.  Nor would Section 4(b)(2) violate the equal sovereignty principle set out in *Shelby

County*, 570 U.S. 529 (2013), as Section 4(b)(2) provided all states that register voters with a

choice between NVRA requirements and Polling Place EDR, and the application of NVRA

requirements is rationally related to targeted problems and continues to reflect current conditions

in the states.  Finally, with the Elections Clause providing independent and sufficient authority

for Congress to enact the NVRA, this Court need not address PILF's arguments under the

Fourteenth and Fifteenth Amendments, although the Reconstruction Amendments nevertheless provide independent authority for the Act.[2]

## I.   PILF Lacks Standing to Bring an Equal Sovereignty Challenge to the NVRA Because PILF Has No Individual Interest in the Equal Sovereignty Rights of the States.

PILF, in contending that Section 4(b)(2) violates the equal sovereignty principle, Compl. ¶¶ 50-75, does not "assert [its] own legal rights and interests."  *Kowalski*, 543 U.S. at 129 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  It instead "rest[s its] claim to relief on the legal rights or interests of third parties"—specifically, the equal sovereignty rights of the states and their subdivisions.  *Id.* (citation omitted).  That it cannot do.  *Id.*; *see also Powers v. Ohio*, 499 U.S. 400, 410 (1991).  PILF does not plead facts or present argument that would support excepting this case from the general rule against third-party standing.  And though PILF invokes *Bond v. United States*, 564 U.S. 211 (2011), and *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999), those cases do not transform the states' equal sovereignty rights into a private interest held by PILF.

---

[2] The United States analyzes this matter as a general challenge to Section 4(b)(2) of the NVRA for three reasons.  First, although PILF frequently cites Section 4(b) in its entirety, *see, e.g.*, Compl. ¶ 3, only Section 4(b)(2) applies to Wisconsin.  PILF does not present arguments concerning North Dakota, the only state subject to Section 4(b)(1).  In any case, PILF's alleged informational injury is not fairly traceable to Section 4(b)(1), so PILF lacks Article III standing to challenge that provision.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015) ("The fact that a plaintiff has suffered an injury that is traceable to" one statutory provision does not grant standing to challenge "a neighboring provision.").  Second, PILF has not explained how to apply its equal sovereignty theory only to Wisconsin, *see* Compl. ¶ 3, when Wisconsin is identically situated to Idaho, New Hampshire, Minnesota, and Wyoming.  Indeed, PILF has lodged the same arguments here and in its challenge to Section 4(b)(2) in Minnesota.  *See* PILF Opp'n, *Pub. Interest Legal Found. v. Simon*, No. 0:24-cv-1561 (D. Minn. June 12, 2024), ECF No. 16.  Third, PILF has not explained how its challenge to Section 4(b)(2)'s exemption can be limited to Section 8(i), as Section 4(b)(2) renders the entirety of the NVRA nonapplicable to qualifying States.  *See* Compl. ¶ 3; *see also* 52 U.S.C. § 20503(b)(2).  A court cannot rewrite Section 4(b)(2) to carve Section 8(i) out of legislative compromises.  *See, e.g.*, *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).

**A.      PILF Does Not Have Third-Party Standing to Bring its Equal Sovereignty Argument.**

In arguing that Section 4(b)(2) violates *Shelby County*, *see* PILF Opp'n 22-25; Compl. ¶¶ 50-75, PILF necessarily asserts the interests of the states in their equal sovereignty.  But, of course, PILF is not a state, a sub-jurisdiction of a state, or an authorized representative of a state. It thus cannot assert the equal sovereignty rights of a state.  *See, e.g.*, *Kowalski*, 543 U.S. at 129-30.  And, though exceptions to the general rule are permitted when the third party can "make two additional showings[:] . . . a 'close' relationship with the person who possesses the right, and . . . a 'hindrance' to the possessor's ability to protect his own interests," PILF meets neither precondition.  *Id.* at 130 (quoting *Powers*, 499 U.S. at 411); *see also Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000).

PILF does not allege it has any relationship to any state, let alone the required "close" one.  *Powers*, 499 U.S. at 411; *cf. Hollingsworth v. Perry*, 570 U.S. 693, 709-14 (2013) (setting out ways in which a state authorizes parties to act on its behalf).  Certainly, PILF cannot claim the requisite relationship with Wisconsin, to which it is *opposed* in this litigation.  Nor does PILF allege that it has a "sufficiently close relationship" with any state that is supposedly disadvantaged by not falling under Section 4(b)(2).  *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996); *cf. Kowalski*, 543 U.S. at 131 ("The attorneys before us do not have a 'close relationship' with their alleged [hypothetical future] 'clients'; indeed, they have no relationship at all.").

Likewise, PILF nowhere alleges, much less shows, that the covered states themselves face any "hindrance" to their "ability to protect [their] own interests."  *Kowalski*, 543 U.S. at 130 (quoting *Powers*, 499 U.S. at 411).  Indeed, it would be difficult to see how any such argument could be made, given the challenges states have already mounted—and lost—to the

NVRA.  *See, e.g.*, *Voting Rights Coal.*, 60 F.3d at 1412-16; *Edgar II*, 56 F.3d at 792-96; *Miller II*, 129 F.3d at 836-38; *see also Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) ("No practical barriers exist if the third party actually asserts his own rights.").  PILF thus cannot establish that states' "failure to assert a claim in [their] own right 'stems from disability,' not 'disinterest.'"  *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (citation omitted).[3]

The prohibition on third-party standing exists to prevent courts from needlessly deciding "abstract questions of wide public significance" when "judicial intervention may be unnecessary to protect individual rights."  *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 500).  The prohibition likewise recognizes that the actual rights-holders, not third parties, have "the appropriate incentive to challenge (or not challenge) governmental action."  *Id.*  PILF's attempt to press the states' equal sovereignty rights implicates both concerns, and PILF fails to explain why a departure from the general rule is warranted here.

**B.      PILF Has No Individual Interest in the Equal Sovereignty of the States.**

Nor can PILF rescue its equal sovereignty argument by asserting an individual interest in the vindication of that principle.  *Bond* and *Gillespie*, upon which PILF relies, *see* PILF Opp'n 23-25, hold that individuals who allege a deprivation of liberty caused by impermissible federal encroachment on state power in violation of the Tenth Amendment have a personal interest in righting the federal-state balance.  But because these cases are distinguishable as to the harms, rights, and relief sought, they do not grant PILF an individual interest to argue for the expansion

---

[3] PILF raises claims directly under the NVRA's disclosure provision, seeking records and alleging that Wisconsin's "NVRA Exemption is invalid with respect to" that disclosure provision.  Compl. ¶¶ 148-178.  The same third-party standing analysis would have governed if PILF had asserted constitutional claims directly under *Shelby County* or *City of Boerne*.  Either way, PILF is not a state or sub-jurisdiction, and it has no legal interest in states' equal treatment.  And the NVRA's status as Elections Clause legislation, *see* Section III, *infra*, in any event, would obviate the need to establish that Section 4(b)(2) is congruent and proportional Fourteenth Amendment legislation, *see* Section V, *infra*.

of federal regulation over states on equal sovereignty grounds.

First, PILF does not allege the same type of harm that gave rise to an individual interest in *Bond* and *Gillespie*. Those cases involved an "enforcement," *Bond*, 564 U.S. at 222, of federal law against the individuals that "constrained" the actions of the litigants, *Gillespie*, 185 F.3d at 701. The federal overreach alleged by those litigants "deprive[d]" those litigants, *id.*, of their "individual liberty," *Bond*, 564 U.S. at 223-24. And both cases held that those litigants had an individual interest in rectifying government overreach that would "direct or control" their conduct. *Id.* at 222.

But PILF posits a different harm. PILF alleges only that, because Wisconsin denied PILF's NVRA request, PILF "fail[ed] to receive particular information." *FEC v. Akins*, 524 U.S. 11, 22 (1998); PILF Opp'n 34. But PILF does not explain why not receiving information remotely compares to a harm caused by the federal government's impermissible "direct[ion]" and "control," *Bond*, 564 U.S. at 222, of individuals that "constrain[s]" their actions, *Gillespie*, 185 F.3d at 701. There is no federal law that is being "enforce[d]" against PILF in a manner that "causes injury." *Bond*, 564 U.S. at 222. Instead, PILF claims only that Wisconsin deprived PILF of information it requested—information that, absent the NVRA, PILF would not be entitled under federal law to demand from any state. Any such injury is not enough to confer an individual interest in equal sovereignty. Ultimately, PILF's complaint is that it was injured by Congress's *failure* to apply a federal law, with its corresponding burdens, to a third party: Wisconsin.[4]

---

[4] PILF also appears to assume that the individual interest granted by *Bond* and *Gillespie* entitles an individual pressing an equal sovereignty claim to litigate a case as if it were standing in the shoes of the states. *See*, *e.g.*, PILF Opp'n 28-29. But, as noted, nothing in *Bond* and *Gillespie* suggests that an individual vindicating the personal interest recognized in those cases should be understood so expansively.

Second, the reasoning underpinning *Bond* and *Gillespie* makes those cases inapt here. *Bond* and *Gillespie* were predicated on protecting individuals from federal overreach that displaced state laws to which those individuals would otherwise be subject.  The federal criminal conviction in *Bond* and the federal post-conviction prohibition on gun possession in *Gillespie* directly resulted from "laws that upset the constitutional balance between the National Government and the States."  *Bond*, 564 U.S. at 222; *see Gillespie*, 185 F.3d at 703-04.  Both the *Bond* and *Gillespie* courts, in finding that the individual litigants had individual interests in federalism principles, reasoned that those principles were intended to protect individuals from direct harm inflicted by such overreach.  *See Bond*, 564 U.S. at 222 ("Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions."); *Gillespie*, 185 F.3d at 703 ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. . . . '[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" (quoting *New York v. United States*, 505 U.S. 144, 181 (1992))).  And the individual litigants in both cases could draw a direct line between their injury and the specific state laws they would have been subject to but for the alleged federal encroachment into the sovereignty of that state.  *Bond*, 564 U.S. at 224-25 (explaining that, in the absence of the federal criminal statute under which she was charged, criminal defendant would have been subject only to Pennsylvania's criminal law); *Gillespie*, 185 F.3d at 700 (explaining plaintiff's contention that the federal post-conviction bar on firearm possession improperly restricted Indiana's right to regulate its state militia).

In this case, however, PILF does not argue that its purported injury resulted from federal encroachment on a particular state's equal sovereignty rights in a way that displaces or overrides

11

that state's laws.  Nor does PILF claim that any purported encroachment changed the legal

framework to which PILF was subject.  Instead, PILF asserts that its injury is caused by the

federal government's *insufficient* regulation of Wisconsin—a state in whose sovereignty PILF

has pled no interest—by *exempting* that state from the NVRA's disclosure provisions.  *See* PILF

Opp'n 29.  In stark contrast to the criminal defendant in *Bond* and the plaintiff in *Gillespie*, PILF

is not invoking the equal sovereignty principle to alleviate federal burdens that Congress

imposed on a state that, in turn, restricted PILF's liberty.  *Cf. Shelby Cnty.*, 570 U.S. at 540-41

(describing covered jurisdiction's request to enjoin preclearance).  Instead, PILF invokes the

principle to *increase* federal burdens on Wisconsin, a state that Congress exempted from the

NVRA.  PILF—a litigant that has suffered no restriction on its liberty, and that beseeches this

court to impose *more* federal regulations on a state—is thus particularly poorly positioned to

invoke a constitutional principle that is designed to *protect* the states.

## II.    Section 4(b)(2) Is a Valid Exercise of Congress's Power Under the Elections Clause.

The NVRA is a valid exercise of Congress's plenary authority under the Elections

Clause, U.S. Const. art. I, § 4, cl. 1.  *See, e.g.*, *Edgar II*, 56 F.3d at 792-96; *see also ITCA*, 570

U.S. at 7-8.  PILF concedes this.  *See* Compl. ¶ 10.  The Elections Clause provides, "The Times,

Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in

each State by the Legislature thereof; but the Congress may at any time by Law make or alter

such Regulations, except as to the Places of chusing Senators."[5]

> [T]hese comprehensive words ["Times, Places and Manner"] embrace authority to
> provide a complete code for congressional elections, not only as to times and places,

---

[5] The Elections Clause does not refer to presidential elections.  However, Article II, Section 1, which does address that subject, "has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections."  *Edgar II*, 56 F.3d at 793 (citing *Burroughs v. United States*, 290 U.S. 534 (1934)); *see also Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976); *Burroughs*, 290 U.S. at 545; *Ex parte Yarbrough*, 110 U.S. 651, 662 (1883) (applying Necessary and Proper Clause).

> but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also, e.g.*, *ITCA*, 570 U.S. at 8-9 (acknowledging that "Times, Places, and Manner" includes "registration"); *Ex parte Siebold*, 100 U.S. 371, 379-80, 383-84 (1880) (upholding a statute providing for federal supervision of a state's voter registration process as a proper exercise of the "Times, Places and Manner" authority).

When Congress exercises its authority to "alter" state regulations of federal elections, that authority "is paramount, and may be exercised at any time, and to any extent which it deems expedient." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 392). Elections Clause legislation triggers weaker "federalism concerns" than typical preemption under the Supremacy Clause, *id.* at 14, because "[t]he [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices," *Foster v. Love*, 522 U.S. 67, 69 (1997) (internal citation omitted). Elections Clause legislation also does not require a presumption against preemption because such legislation "*necessarily* displaces some element of a pre-existing legal regime erected by the States." *ITCA*, 570 U.S. at 13; *see also, e.g.*, *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 723 (7th Cir. 2021); *Fish v. Kobach*, 840 F.3d 710, 731-32 (10th Cir. 2016) (rejecting plain statement rule); *cf. Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991) (imposing a plain statement rule to protect federalism interests).

Congress's preeminent power under the Elections Clause authorizes the nonapplicability rule in Section 4(b)(2). Courts have unanimously held that the NVRA's general procedures governing registration to vote in elections for federal office fall within Congress's Elections

Clause authority. *See, e.g.*, *Edgar II*, 56 F.3d at 792-96.[6]  Section 4(b)(2) allowed states to avoid the specific mandates of the NVRA by adopting and maintaining Polling Place EDR.  *See* 52 U.S.C. § 20503(b)(2).  Congress initially applied this provision only to states with Polling Place EDR already in place, Pub. L. No. 103-31, § 4(b)(2), 107 Stat. at 78, but ultimately set a deadline nearly 15 months after the NVRA became law, *see* 52 U.S.C. § 20503(b)(2).  This extended the provision to include two states that had implemented Polling Place EDR after the original deadline but before the NVRA went into effect, *see* 1994 Idaho Sess. Laws ch. 67 § 5 (codified at Idaho Code § 34-408A); 1994 N.H. Sess. Laws ch. 154 (codified at N.H. Rev. Stat. § 654:7-a).

In effect, Congress authorized two alternative regimes—Polling Place EDR or the specific requirements of the NVRA—and honored certain state legislative choices made prior to August 1, 1994.  *Compare* House Report at 4 ("The Committee concluded that while the concept of 'same day' registration might be desirable it would not be feasible to mandate such a procedure.") *with* Senate Report at 22 ("It is not the intent of this legislation to encourage the adoption of election day registration.").  Thus, in passing Section 4(b)(2), Congress properly exercised its Elections Clause authority to preempt specific "state legislative choices," *Foster*, 522 U.S. at 69, and to dictate procedures only to the "extent which it deem[ed] expedient," *ITCA*, 570 U.S. at 9.

## III.    *Shelby County*'s Equal Sovereignty Principle Does Not Apply to the NVRA.

PILF claims that Section 4(b)(2) violates *Shelby County*'s equal sovereignty principle.  It does not.  Indeed, *Shelby County*'s equal sovereignty principle is not even implicated here

---

[6] *See also Voting Rights Coal.*, 60 F.3d at 1412-16, *cert. denied*, 516 U.S. 1093 (1996); *Miller II*, 129 F.3d at 836-38; *Condon*, 913 F. Supp. at 960-67; *Virginia v. United States*, No. 3:94-cv-357, 1995 WL 928433, at *1 (E.D. Va. Oct. 18, 1995); *Ass'n of Cmty. Orgs. for Reform Now v. Ridge*, No. Civ. A. 94-7671, 1995 WL 136913, at *6-8 (E.D. Pa. Mar. 30, 1995); *cf. ITCA*, 570 U.S. at 19 (holding that "no constitutional doubt is raised by giving [a] provision of the NVRA its fairest reading").

because that principle applies to Congress's Fifteenth Amendment power—not its Article I powers.  And, fatal to PILF's argument, that principle does not apply to the Elections Clause, which affords Congress plenary power to regulate federal elections.

The Supreme Court in *Shelby County* articulated an equal sovereignty principle limiting Congress's authority to enforce the Fifteenth Amendment through the VRA's preclearance provisions.  Notably, the Supreme Court did not "pronounce on how or whether this standard might apply to different exercises of legislative authority under the Fourteenth and Fifteenth Amendments, much less announce a test applicable to" other constitutional provisions.  *United States v. Diggins*, 36 F. 4th 302, 315-16 (1st Cir. 2022).  The *Shelby County* Court found the VRA's preclearance coverage formula unconstitutional because, in part, the equal sovereignty principle acted as a limit to Congress's Fifteenth Amendment authority to impose disparate restrictions on state election procedures.  570 U.S. at 555-57.  Congress, using its Fifteenth Amendment power to enforce the amendment's guarantee of the right to vote "by appropriate legislation," had enacted VRA preclearance provisions that required a small subset of states and sub-jurisdictions to obtain federal permission before changing voting laws.  *Id.* at 536-37.  This meant that some states suffered the burdens of waiting "months or years and expend[ing] funds to implement a validly enacted law" while other states could put the same law into effect through its normal legislative process.  *Id.* at 544-45.  The Supreme Court repeatedly noted that the VRA was "extraordinary legislation otherwise unfamiliar to our federal system" and determined that its preclearance requirements intruded "into a sensitive area of state and local policymaking" that had traditionally been the exclusive province of the states.  *Id.* at 545, 546, 549, 555.  In this singular context, the Supreme Court noted that a "principle of equal sovereignty" was relevant in assessing "subsequent disparate treatment of States."  *Id.* at 544.  Ultimately, the Supreme Court

held that the VRA's preclearance coverage formula was unconstitutional because the "current

burdens" were not justified by "current needs" and that the "disparate geographic coverage" was

not "sufficiently related to the problem that it target[ed]." *Id.* at 550-51.

**A.    Courts Have Declined to Apply *Shelby County*'s Equal Sovereignty Principle to Article I Legislation.**

Since *Shelby County*, neither the Supreme Court nor any other court has held that the

equal sovereignty principle acts as a limit on Congress's Article I powers. *See Ohio v. EPA*, 98

F.4th 288, 308 (D.C. Cir. 2024), *cert. pending*, No. 24-7 (filed July 2, 2024) and No. 24-13 (filed

July 5, 2024).   In fact, several courts have expressly declined to apply the equal sovereignty

principle to Article I legislation.   *See, e.g.*, *id.* at 311 ("*Shelby County* does not extend the

principle even further to any (let alone all) Article I legislation.").   For example, in the Article I

context, courts have declined to apply the equal sovereignty principle to a single-state exception

to an anti-gambling statute passed under Congress's Article I Commerce Clause power because,

in part, "Congress's exercises of Commerce Clause authority are aimed at matters of national

concern and finding national solutions will necessarily affect states differently," *NCAA v.

Governor of N.J.*, 730 F.3d 208, 238-39 (3d Cir. 2013), *abrogated on other grounds by N.J.

Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453 (2018); the maintenance-of-effort

(MOE) provision of the Patient Protection and Affordable Care Act passed pursuant to

Congress's Article I Spending Clause powers because, among other reasons, the MOE provision

"does not intrude on an area of traditional state concern," *Mayhew*, 772 F.3d at 93-97; and a tax

deduction cap enacted pursuant to Congress's Article I tax power, *New York v. Yellen*, 15 F.4th

569, 584 (2d Cir. 2021).[7]

---

[7] This is also consistent with courts' reluctance to apply the equal sovereignty principle as a limit to other
Congressional powers.   *See e.g.*, *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018) (holding that

Courts' refusal to apply the equal sovereignty principle to Article I legislation makes sense because the scope of Congress's Article I powers is fundamentally different from the scope of its Fifteenth Amendment powers. Unlike the Fifteenth Amendment, which limits Congress's enforcement power to "appropriate legislation," Article I contains no such phrase. *See Ohio*, 98 F.3d at 309 (addressing Commerce Clause). *Compare* U.S. Const. amend. XV, § 2, *with* U.S. Const. art. I. Instead, Article I provides Congress with plenary authority to enact laws within its enumerated powers and to pass any legislation "necessary and proper" for executing those enumerated powers. U.S. Const. art. I, § 8, cl. 18; *see also Haaland v. Brackeen*, 599 U.S. 255, 273 (2023). One such enumerated power is Congress's authority to regulate federal elections under the Elections Clause. U.S. Const. art. I, § 4, cl. 1.

**B.     *Shelby County*'s Equal Sovereignty Principle is Inapplicable to Elections Clause Legislation Like the NVRA.**

As a general matter, legislation passed pursuant to Congress's Elections Clause authority does not implicate the equal sovereignty principle. First, the text of the Constitution does not suggest an equal sovereignty limit on Congress's Elections Clause authority. In the few instances within Article I where the Constitution promises equality among the states, it articulates those with particularity. For instance, Article I, Section 8 states that laws concerning bankruptcy, naturalization, and duties shall be "uniform." U.S. Const. art. I, § 8, cl.1, cl. 4. Likewise, Article I, Section 9 prohibits "[p]reference . . . given by any Regulation of Commerce

---

*Shelby County* did not "address[] Congress's power to legislate under the Thirteenth Amendment"); *Herron v. Governor of Pa.*, 564 F. App'x 647, 649 (3d Cir. 2014) (declining to extend *Shelby County* to a Fourteenth Amendment Equal Protection claim); *United States v. Focia*, No. 2:15-cr-17, 2015 WL 3672161, at *6 (M.D. Ala. June 12, 2015), *aff'd* 869 F.3d 1269 (11th Cir. 2017) (concluding that "*Shelby County* is inapposite in the Second Amendment context except to the extent one might attempt to synthesize some all-encompassing rule to be applied in any context where consideration of the continued utility of a law is in order").

or Revenue to the Ports of one State over those of another." U.S. Const. art. I, § 9, cl. 6.[8] These sections show that "the Founders plainly knew how to include equality-based protections for states in Article I when they wished to." *Ohio*, 98 F.4th at 312. The Election Clause contains no such equality-based promises. "The fact that some constitutional clauses explicitly contain an equality-based guarantee therefore supports a negative inference" that the Elections Clause does not contain a "broad equal sovereignty principle." *Id.*[9]

Second, unlike other congressional powers, the power to regulate elections of federal offices does not intrude into an area traditionally reserved to the states because such offices did not exist prior to the Constitution. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 799, 803-04

---

[8] Even when exercising these powers, Congress may make geographic distinctions when relevant to the problem the legislation seeks to solve, if it does not arbitrarily discriminate by geography or between States. *See, e.g.*, *Siegel v. Fitzgerald*, 596 U.S. 464, 478 (2022) (bankruptcy); *United States v. Ptasynski*, 462 U.S. 74, 84-85 (1983) (duties); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 435 (1855) (ports).

[9] The Elections Clause's original rationale and ratification history confirm that the equal sovereignty principle has no place in this field. The delegates at the Constitutional Convention defeated a motion to remove the portion of the Elections Clause that authorizes Congress to "make or alter" state regulations of federal elections, with those who spoke against the motion citing the need for congressional authority to override abuses by particular states. 2 *The Records of the Federal Convention of 1787*, at 240-41 (Max Farrand ed., 1966), https://perma.cc/6AQB-6AUW. The Federalist Papers hit on the same theme, arguing that leaving "an exclusive power of regulating elections for the national government, in the hands of the state legislatures, would leave the existence of the Union entirely at their mercy," allowing any state to undermine the national government "by neglecting to provide for the choice of persons to administer its affairs." *The Federalist* No. 59, at 361 (Clinton Rossiter ed. 2003) (A. Hamilton); *see also ITCA*, 570 U.S. at 8 ("This grant of congressional power was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress."). And in the ratifying conventions, Federalists defended Congress's Elections Clause power both as a means of preventing states from refusing to send representatives to Congress and as a way of preventing any state from manipulating election laws in ways that deny voters equal rights. *See, e.g.*, 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 26-27, 49-51 (Jonathan Elliot ed., 2d ed. 1836), https://perma.cc/6M66-TP8G; 3 *id.* at 366-67, https://perma.cc/CX9V-XGP9; Pauline Maier, *Ratification: The People Debate the Constitution, 1787-1788*, at 174, 178, 210, 448 (2010); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 224, 401 n.47 (1996). The Founding generation thus understood the text of the Elections Clause to ensure that, whatever regulations a given state might (or might not) adopt, "Congress may supplement these state regulations or may substitute its own." *Smiley*, 285 U.S. at 366-367. Because threats or abuses might come only from certain states, Congress had to have power to "make or alter" the regulations of fewer than all the states. U.S. Const. art. I, § 4, cl. 1.

(1995).  The Constitution "create[d] an entirely new National Government with a National Executive, National Judiciary, and a National Legislature."  *Id.* at 803 (citation omitted).  "[N]o original prerogative of state power to appoint a representative, a senator, or president for the union" existed, nor could it, because such federal offices did not exist.  *Id.* at 803-04.

The Constitution's "provisions governing elections reveal the Framers' understanding that powers over the election of federal officers had to be delegated to, rather than reserved by, the States."  *Id.* at 804.  It must because "representatives [in the new National Government] owe primary allegiance not to the people of a State, but to the people of the Nation."  *Id.* at 803.  Specifically, as mentioned, the Elections "Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'"  *ITCA*, 570 U.S. at 9 (quoting *Foster*, 522 U.S. at 69).  As the *Shelby County* Court recognized, the Elections Clause is a clear example of the federal government retaining "significant control" over a particular subject (*i.e.*, federal elections).  *Shelby Cnty.*, 570 U.S. at 543 ("Of course, the Federal Government retains significant control over federal elections.  For instance, the Constitution authorizes Congress to establish the time and manner for electing Senators and Representatives.  Art. I, § 4, cl.1.").  Because the NVRA is a valid exercise of Congress's plenary authority under the Elections Clause to regulate federal elections—a power that has never been reserved to states—it does not implicate the equal sovereignty principle articulated in *Shelby County*.  *See Kobach v. EAC*, 772 F.3d 1183, 1198 (10th Cir. 2014) ("Accordingly, Shelby County does not cast doubt on the NVRA's constitutionality.").  PILF's attempt to graft an "equal sovereignty" principle into the Elections Clause should be rejected.

**IV.     Section 4(b)(2) Does Not Raise Equal Sovereignty Concerns.**

Even if the equal sovereignty principle articulated in *Shelby County* applied to Elections Clause legislation—and it does not—Section 4(b)(2) of the NVRA would not trigger state sovereignty concerns.  Section 4(b)(2) provided all states that register voters with a time-limited choice between detailed statutory procedures for federal elections and Polling Place EDR. Limiting applicability of the NVRA for states that adopted Polling Place EDR before a statutory deadline rationally targets voter participation, whereas information requests play a secondary role in the statutory scheme.  Finally, current conditions continue to warrant application of Section 4(b)(2), particularly because this provision eliminates burdens on states.

**A.     The NVRA Affords Equal Treatment to the States.**

Unlike the VRA's preclearance provisions, the NVRA does not "target[] only some parts of the country."  *Shelby Cnty.*, 570 U.S. at 537.  Rather, the NVRA ultimately allowed states that register voters to follow prescribed procedures for registration to vote in federal elections or authorize Polling Place EDR during a limited window following enactment.  *See* 52 U.S.C. § 20503(b).  New Hampshire, for instance, expressly tied its adoption of Polling Place EDR to enactment of the NVRA.  *See* 1994 N.H. Sess. Laws ch. 154 ("AN ACT relative to the National Voter Registration Act of 1993 . . . .").  Thus, each state retained equal sovereignty, subject to a uniform preemptive framework.  *See, e.g.*, *Mayhew*, 772 F.3d at 94 (holding that Affordable Care Act's maintenance-of-effort provision does not "result[] in 'disparate treatment' of states" under *Shelby County* because it "applies the same rule to each state: freeze eligibility standards in existence as of March 23, 2010 until October 1, 2019, or risk losing Medicaid funding").

The contrast between the NVRA and *Shelby County* is stark.  The VRA's preclearance formula had been "reverse-engineered" in 1965 and in a 1975 expansion to cover identified jurisdictions based on historical criteria.  *Shelby Cnty.*, 570 U.S. at 551; *see also id.* at 537 (1965

20

formula based on 1964 criteria); *id.* at 538 (1975 expansion based on 1972 criteria).  This

resulted in intentional distinctions between the states and the potential to "bring within its sweep

governmental units not guilty of any unlawful discriminatory voting practices."  *Briscoe v. Bell*,

432 U.S. 404, 411 (1977).  The NVRA did not pick and choose in the same manner; each state

ultimately chose its regulatory regime.[10]

> **B.      Section 4(b)(2) Is Related to the Problems Targeted by the NVRA.**

Section 4(b)(2) of the NVRA meets the targeting requirements for legislation subject to

*Shelby County*.  Where it applies, *Shelby County* demands only that a statute's "disparate

geographic coverage is sufficiently related to the problem that it targets."  570 U.S. at 542

(quoting *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).  This test

requires only a rational connection between triggering conditions and targeted ills.  *See id.* at

544; *see also South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966) (upholding the original

coverage formula as "rational in both practice and theory").  And here, Congress engaged in

reasoned lawmaking by limiting the NVRA's applicability in states that adopted Polling Place

EDR prior to implementation.

Congress rationally chose to only apply the NVRA to those states not already

"enhanc[ing] the participation of eligible citizens as voters in elections for Federal office," 52

U.S.C. § 20501(b)(2), through Polling Place EDR, *see id.* § 20503(b)(2).  Congress's concerns

about increasing voter registration and participation suffuse the NVRA.  Congress made those

concerns the focus of its official findings, *id.* § 20501(a), and of the NVRA's first two statutory

---

[10] That Congress retroactively expanded that window is of little import.  States still could choose between two alternatives or even lobby for and receive a deadline extension, as Idaho and New Hampshire did. *See* 1994 Idaho Sess. Laws ch. 67 § 5 (adopting Polling Place EDR after NVRA enactment); 1994 N.H. Sess. Laws ch. 154 (same); *see also* 141 Cong. Rec. 27071-72 (1995) (Statement of Sen. Ford) (describing amendment to Section 4(b)(2) to "validate" Idaho and New Hampshire legislation).

purposes, *id.* § 20501(b)(1)-(2), as well as of the statutory recitation of the Act's general provisions, *id.* § 20503(a); *see also, e.g.*, *Edgar II*, 56 F.3d at 792 ("The National Voter Registration Act . . . is designed to make it easier to register to vote in federal elections."). Congress then determined that federal intervention to ease voter registration procedures was unwarranted where states already authorized Polling Place EDR.  *See* Senate Report at 22-23 (explaining that Polling Place EDR "lessened the impediments to registration" to a degree "beyond the requirements of the" NVRA); House Report at 6 (same).  Section 4(b)(2) is thus tightly related to the problem the NVRA targets.

Congress also determined that, where federal legislation dictates procedures for voter registration, federal law should also establish rules governing voter registration list maintenance. *See* 52 U.S.C. § 20507; *see also id.* § 20501(b)(3)-(4) (additional statutory purposes listed after enhancing registration and participation); House Report at 5 ("Ensuring that expanding the opportunities to register would in no way weaken the validity of the registration rolls was a priority for the Committee."); Senate Report at 18 ("An important goal of this bill, to open the registration process, must be balanced with the need to maintain the integrity of the election process by updating the voting rolls on a continual basis.").  But, where Congress determined that federal regulation of the voter registration process was unnecessary, Congress had the authority to determine that federal regulation of the list maintenance process was unnecessary as well.  *See* 52 U.S.C. § 20503(b); *see also, e.g.*, *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (recognizing that "the proper balance" within the NVRA "is a policy question properly decided by the legislature, not the courts").

PILF tries to paint the NVRA as a transparency statute, *see* PILF Opp'n 1, 6-7, 15-17, but PILF cannot simply ignore all but the Act's secondary disclosure provision.  The NVRA's

statutory findings and purposes say nothing about transparency.  *See* 52 U.S.C. § 20501.  Public disclosure makes no appearance until the ninth subsection of the eighth section of the Act, *see* 52 U.S.C. § 20507(i), and "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).[11]  Thus, the NVRA does not contain a "Disclosure Exemption."  *Contra* PILF Opp'n 1-3, 11, 15, 19-22, 25, 28, 30-33, 36.  Rather, Section 4(b)(2) renders a complete regulatory regime focused on voter registration and registration list maintenance procedures nonapplicable to states that chose to adopt and maintain Polling Place EDR.  *See* 52 U.S.C. § 20503(b)(2).[12]

    *Shelby County* addresses only whether "disparate geographic coverage is sufficiently related to the problem that it targets."  570 U.S. at 542 (quoting *Nw. Austin*, 557 U.S. at 203).  The design of Section 4(b)(2) is so related.  Congress identified the need to increase voting access and voter participation and created Section 4(b)(2) to target those problems.  *Shelby County* does *not* address whether legislation targets objectives that a litigant deems "necessary" but Congress did not, or whether "Congress may have overlooked" those other matters.  PILF Opp'n 30.  "If anything, [PILF's] quarrel seems to be with [the NVRA's] actual goal[s] rather

---

[11] Because transparency was not an independent purpose or objective of Congress in passing the NVRA, Section 8(i) preempts state laws that limit disclosure and use of list maintenance records in a manner that conflicts with an express statutory purpose but permits states to redact sensitive information.  *See Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 54-56 (1st Cir. 2024).  In fact, PILF concedes that transparency is only a "means to achieve" the express statutory purposes of the Act.  PILF Opp'n 18-19.

[12]  PILF makes much of the fact that "Wisconsin is currently not required to maintain all voter list maintenance records for at least two years," as the NVRA requires of covered states.  PILF Opp'n 7.  However, another provision of federal law—unmentioned by PILF—requires election officials to "retain and preserve, for a period of twenty-two months from the date of any [federal] election . . . , all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ."  52 U.S.C. § 20701.  In turn, the Attorney General may demand any such record from election officials in any state.  *See id*. § 20703.  Thus, even in states not subject to Section 8(i), voter registration list maintenance determinations are not "made in the dark."  *Contra* PILF Opp'n 3.

than with the manner in which it operates."  *NCAA*, 730 F.3d at 239.

###### C.    Current Conditions Support Section 4(b)(2).

Section 4(b)(2) of the NVRA also continues to reflect current conditions in the states.  In *Shelby County*, the Supreme Court said the VRA imposed "current burdens" that had to be "justified by current needs."  570 U.S. at 550 (citation omitted).  PILF's argument upends that principle.  *Shelby County* required ongoing scrutiny of the VRA's preclearance formula because preclearance "authorizes federal intrusion into sensitive areas of state and local policymaking, and represents an extraordinary departure from the traditional course of relations between the States and the Federal Government."  *Id.* at 545 (internal quotation marks and citations omitted).  But Section 4(b)(2) is not an example of federal intrusion; it reflects federal restraint.  The NVRA establishes nationwide procedures for federal elections, with only seven states exempt under Section 4(b)(1) and Section 4(b)(2).  *Cf.* U.S. Dep't of Justice, *Jurisdictions Previously Covered by Section 5*, https://perma.cc/W5M7-6MVU (noting coverage of only nine states and scattered sub-jurisdictions).  Yet PILF argues that "current needs" compel federal courts—not Congress—to subject more states—not fewer—to federal regulation.  Nothing in *Shelby County* suggests that Congress must meet a current conditions requirement to justify an *exemption* from federal regulation.[13]

Even if its "current conditions" requirement did apply under these circumstances, *Shelby County* merely required a "logical relation" between the basis for coverage and the present day.  570 U.S. at 554; *see also id.* at 556 (striking down preclearance formula as "irrational").

---

[13] This merits analysis is distinct from whether "leveling down" may be an appropriate remedy for a violation of the equal sovereignty principle articulated in *Shelby County*.  *See* PILF Opp'n 28-29.  *Ohio v. EPA*, on which PILF principally relies, held that regulated states had a redressable injury but rejected their equal sovereignty claim.  *See* 98 F.4th 288, 308, *petitions for cert. pending*, No. 24-7 (filed July 2, 2024) and No. 24-13 (filed July 5, 2024).

"[T]hose attacking the rationality of a legislative classification have the burden to negative every conceivable basis which might support it." *FCC v. Beach Comm'ns*, 508 U.S. 307, 315 (1993) (internal citation and quotation marks omitted). Yet Congress rationally limited Section 4(b)(2) to states that adopted Polling Place EDR by a statutory deadline. The deadline limits federal pressure to adopt this procedure, as the Senate demanded as a condition for passing the NVRA. 139 Cong. Rec. 9632 (1993) (statement of Sen. McConnell). At the same time, the deadline also prevents states from later exempting themselves from the NVRA by adopting Polling Place EDR, which would then allow them to repeal the various other methods of voter registration successfully implemented pursuant to the NVRA. Ultimately, Section 4(b)(2) was and remains sufficiently dynamic to maintain a rational fit between "current conditions" and application of the NVRA.

First, Section 4(b)(2) continues to serve the purpose that drove the Senate to insist upon a statutory deadline for states to choose between Polling Place EDR or NVRA regulation: preventing states from feeling ongoing pressure to adopt Polling Place EDR to free themselves from NVRA mandates. *See, e.g.*, 139 Cong. Rec. 9632 (1993) (statement of Sen. McConnell). The August 1, 1994, cutoff still ensures that states—those that register voters for federal elections but do not permit Polling Place EDR—do not adopt Polling Place EDR to avoid costs associated with registration at motor vehicle offices, by mail, and at voter registration agencies.[14]

---

[14] PILF repeatedly asserts that "Wisconsin (and other exempt states)" are among "more than twenty states" that have adopted Election Day registration. PILF Opp'n 2, 19-20. However, PILF fails to distinguish between Polling Place EDR and Election Day registration at other locations. Section 4(b)(2) only applies to Polling Place EDR. *See* 52 U.S.C. § 20503(b)(2); *see also* Senate Report at 22 (describing provision as "specific" and "narrowly drawn"); House Report at 6 (same). Thirteen states and the District of Columbia currently allow Polling Place EDR. *See* Cal. Elec. Code § 2170; D.C. Code § 1-1001.07(g)(5); Haw. Rev. Stat. § 11-15.2; Idaho Code § 34-408A; 10 Ill. Comp. Stat. 5/5-50; Iowa Code § 48A.7A; Md. Code, Elec. Law §§ 3-305, -306; Minn. Stat. § 201.061; Nev. Rev. Stat. §§ 293.5842, .5847; N.H. Rev. Stat. § 654:7-a; Utah Code § 20A-2-207; 17 Vt. Stat. § 2144(b); Va. Code § 24.2-420.1; Wis. Stat. § 6.55(2)(a); Wy. Stat. § 22-3-104(h)(i).

That concern was, and remains, rational. *Cf. Beach Commc'ns*, 508 U.S. at 315-16 ("[That] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." (alteration in original) (citation omitted)).

Second, Section 4(b)(2) and its 1994 deadline prohibit states that have implemented the NVRA from later terminating the forms of registration that the NVRA requires them to maintain. *See* 52 U.S.C. § 20503(a) (listing registration methods the statute requires). While authorizing Polling Place EDR after the statutory cutoff in Section 4(b)(2) might reduce the general need for NVRA procedures, Congress reasonably concluded that a state's later decision to do so would not justify eliminating the NVRA's required forms of registration and list maintenance once they already are in place. *See* 141 Cong. Rec. 27071-72 (1995) (statement of Sen. Ford); *see also, e.g.*, FEC, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* (Jan. 1, 1994), https://perma.cc/SGA9-AP8V (describing complexity of implementation). Thus, the states exempted from the NVRA because of prior implementation of Polling Place EDR are differently situated from states that implemented Polling Place EDR after having already implemented forms of registration required by the NVRA. Distinguishing between the two sets of states is not "irrational." *Shelby Cnty.*, 570 U.S. at 556.

Third, Section 4(b)(2) rationally protects the reliance interests of states that authorized Polling Place EDR before the NVRA went into effect. Congress recognized that Polling Place EDR advanced one goal of the NVRA—increasing voter registration—to a greater extent than did the Act's requirements, *see* Senate Report at 22-23, and excluding those states preserved their interest in maintaining the system they had already authorized. Congress increased those reliance interests when it chose to exempt states subject to Section 4(b)(2) of the NVRA from certain mandates of the Help America Vote Act of 2002, 52 U.S.C. §§ 20901-21145, particularly

those built upon the NVRA's existing requirements. *See* 52 U.S.C. § 21082(a) (provisional

balloting); *id.* § 21083(a)(2)(A)(iii) (voter registration list maintenance); *id.* § 21083(b)(5) (mail

voter registration forms); *see also Greater Birmingham Ministries v. Sec'y of State*, 105 F.4th

1324, 1333 (11th Cir. 2024) (noting that when enacting HAVA, Congress "had the perfect

opportunity" to revisit provisions of the NVRA and "amended certain portions . . . by explicit

reference"); *cf.* 52 U.S.C. § 21083(a)(1)(B) (drawing a dividing line for exemption from HAVA

statewide electronic voter registration database requirements). "The protection of reasonable

reliance interests is not only a legitimate governmental objective: it provides an exceedingly

persuasive justification." *Nordlinger v. Hahn*, 505 U.S. 1, 13 (1992) (internal citation and

quotation marks omitted).

Finally, Congress designed a sufficiently dynamic exemption system that would pass

muster if *Shelby County* applied.  Contrary to PILF's assertion otherwise, *see* PILF Opp'n 14

n.4, the NVRA does have a provision to trigger new coverage.  Because Section 4(b) exempts

only states that either do not register voters or allow Polling Place EDR "*continuously* on and

after August 1, 1994," 52 U.S.C. § 20503(b)(1)-(2) (emphasis added), any state that ceases these

practices will become subject to the NVRA.  Moreover, courts have consistently rejected equal

sovereignty attacks on statutes that lack post-enactment opt-ins or opt-outs.  *See, e.g.*, *NCAA*, 730

F.3d at 215-16, 237-39; *Mayhew*, 772 F.3d at 83, 93-97; *see also Ohio*, 98 F.4th at 308-14

(upholding targeted statutory waiver provision without opt-in).[15]

---

[15] It is true, as PILF notes, that the NVRA contains no explicit "bailout" or "bail in" provisions, akin to those in the VRA's preclearance regime. *See* PILF Opp'n 13-15, 26-28 (citing 52 U.S.C. §§ 10302(c), 10303(a)(1)).  But the existence of such mechanisms is hardly decisive.  The VRA's bailout provision is limited, *see Nw. Austin*, 557 U.S. at 199, 209-11, and *Shelby County* struck down the preclearance coverage formula despite those procedures, *see* 570 U.S. at 542-57 (not addressing bailout or bail in during substantive analysis).  Moreover, bailout was available only to jurisdictions that met statutory criteria, again based on past practices. *See* 52 U.S.C. § 10303(a); *Nw. Austin*, 557 U.S. at 199.

Ultimately, Congress has established a "logical relation" between NVRA coverage and the present day, a basis that "makes sense" and "speaks to current conditions."  *See Shelby Cnty.*, 570 U.S. at 553-54, 557.  *Shelby County* requires nothing more.

## V.   This Court Need Not Consider Congress's Enforcement Authority Under the Reconstruction Amendments, which Provide Independent Authority for the Act.

The Elections Clause empowered Congress to enact the NVRA generally and Section 4(b)(2) specifically.  *See, e.g.*, *Edgar II*, 56 F.3d at 793-96; *see also* Senate Report at 4 ("Congress has the power to regulate Federal elections, including the establishment of national voter registration procedures for Presidential and congressional elections . . . under the [Elections] Clause.").  *See generally* Part II, *supra*.  PILF challenges Section 4(b)(2) as an invalid exercise of Congress's constitutional authority to enforce the Fourteenth and Fifteenth Amendments.  Compl., ¶¶ 76-83.  But Congress requires only one source of constitutional authority to enact legislation.  *See, e.g.*, *NFIB*, 567 U.S. at 561, 574-75 (upholding statutory provision as a valid tax, despite holding provision exceeded Commerce Clause authority).  Thus, this Court need not address whether the Fourteenth and Fifteenth Amendments provide further authority for Congress to enact the NVRA, in light of Congress's preemptive authority under the Elections Clause.  *See Miller II*, 129 F.3d at 836 (upholding the NVRA without addressing Reconstruction Amendments); *Voting Rights Coal.*, 60 F.3d at 1412-16 (same); *Edgar II*, 56 F.3d at 793-96 (same); *Edgar I*, 880 F. Supp. at 1221 (concluding that Elections Clause "suffice[s]" to uphold the NVRA, although the Reconstruction Amendments "independently compel the same conclusion").  PILF overlooks that this Court may uphold the NVRA based on a single

---

Importantly, those statutory criteria allowed "piecemeal" bailout of innocent political subdivisions otherwise subject to statewide coverage, a scenario that does not arise under the NVRA.  *See Nw. Austin*, 557 U.S. at 209-11; *Shelby Cnty.*, 570 U.S. at 540 (explaining that Shelby County was ineligible for bailout).

independent and sufficient source of Congressional authority. *See* PILF Opp'n 31-32 (recognizing that "the NVRA is Election[s] Clause legislation" but contending additional authority somehow undercuts the law).

Nevertheless, the NVRA is also a proper exercise of Congress's authority to enforce the Fourteenth and Fifteenth Amendments' constitutional prohibitions on discrimination in voting. *See Edgar I*, 880 F. Supp. at 1221-22; *Ass'n of Cmty. Orgs. for Reform Now v. Miller* (*Miller I*), 912 F. Supp. 976, 984 (W.D. Mich. 1995), *aff'd*, 129 F.3d 833 (6th Cir. 1997); *Condon*, 913 F. Supp. at 967; *see also* Senate Report at 3-4; House Report at 2-3. Specifically, Section 4(b)(2) passes muster under the test articulated in *City of Boerne v. Flores*, 521 U.S. 507 (1997), for Fourteenth Amendment legislation, as well as the more lenient rationality test applicable to Fifteenth Amendment legislation, *see Katzenbach*, 383 U.S. at 330.

The NVRA fits comfortably within Congress's power to "outlaw voting practices that are discriminatory in effect." *Allen v. Milligan*, 599 U.S. 1, 41 (2023) (citation omitted). The Act's text explains that "discriminatory and unfair registration laws and procedures" had "disproportionately harm[ed] voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). And the Act's legislative history includes ample evidence to support that finding. "Restrictive registration laws and administrative procedures were introduced in the United States in the late nineteenth and early twentieth centuries to keep certain groups of citizens from voting: in the North, the wave of immigrants pouring into the industrial cities; in the South, blacks and the rural poor." House Report at 2. Although "the Voting Rights Act of 1965 eliminated the more obvious impediments to registration," it left "a complicated maze of local laws and procedures, in some cases as restrictive as the outlawed practices." *Id.* at 3. The Fourteenth and Fifteenth Amendments empower Congress to adopt uniform federal voter-

registration procedures to address those racial disparities.  And its legislative history confirms that the NVRA is congruent and proportional to the objective of "promot[ing] the exercise" of the "fundamental right" "to vote."  52 U.S.C. § 20501(a)(1) and (2).  If, as PILF appears to concede, the NVRA's burdens would be congruent and proportional if applied to every state, *see* PILF Opp'n 33, then it is hard to see how the imposition of a *lower* burden on some states possibly could remove the "congruence and proportionality" otherwise observed "between the injury to be prevented or remedied and the means adopted," *City of Boerne*, 521 U.S. at 520.

Even if it were possible to violate *City of Boerne* via an *exemption* from regulation, Section 4(b)(2) falls within Congress' "wide latitude" to determine how to balance the NVRA's goals of encouraging voter registration and ensuring election integrity with due regard for states' sovereignty.  *Id.*  Section 4(b)(2) exempts states that adopted Polling Place EDR prior to a statutory deadline.  Such a scheme *enhances* the NVRA's congruence and proportionality, by refraining from regulating states that had adopted an acceptable alternative means of meeting the NVRA's goals.  Likewise, Section 4(b)(2)'s exemption of states that adopted Polling Place EDR prior to a statutory deadline limits federal enforcement and constitutes a rational scheme that weighs in favor of the congruence and proportionality of the NVRA.  *See Edgar I*, 880 F. Supp. at 1222 (describing Section 4(b) of the NVRA as a "rational classification" under the Fourteenth and Fifteenth Amendments).  Finally, although *Shelby County* does impose limitations on Congress's authority to legislate under the Fifteenth Amendment, for the reasons explained above, Section 4(b)(2) of the NVRA meets those requirements.  *See* Part IV, *supra*.  Similarly, while there is no equal sovereignty component to a congruence and proportionality analysis, the NVRA no more violates equal sovereignty in that context than it does in any other.  *See* Part IV, *supra*.

**CONCLUSION**

For the reasons set forth above, the NVRA, including Section 4(b)(2), is constitutional, and Administrator Wolfe's motion to dismiss should be granted with prejudice.


Respectfully submitted,

Date:  September 16, 2024

TIMOTHY M. O'SHEA                      KRISTEN CLARKE
United States Attorney                 Assistant Attorney General
Western District of Wisconsin          Civil Rights Division

*/s/ Barbara L. Oswald*                 */s/ Rachel R. Evans*
LESLIE K. HERJE                        R. TAMAR HAGLER
BARBARA L. OSWALD                      RICHARD DELLHEIM
Assistant U.S. Attorneys               RACHEL R. EVANS
United States Attorney's Office        JUDY J. BAO
Western District of Wisconsin          Attorneys, Voting Section
222 W. Washington Ave, Suite 700       Civil Rights Division
Madison, WI 53703                      U.S. Department of Justice
Phone: (608) 264-5158                  950 Pennsylvania Ave. NW
barbara.oswald@usdoj.gov               Washington, D.C. 20530
                                       Phone: (800) 253-3931
                                       Fax: (202) 307-3961
                                       rachel.evans@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2024, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

/s/ Rachel R. Evans
Rachel R. Evans
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 598-9924
rachel.evans@usdoj.gov