**United States District Court**
**Western District of Wisconsin**

| | |
|---|---|
| **PUBLIC INTEREST LEGAL FOUNDATION, INC.** | |
| *Plaintiff,* | |
| *v.* | |
| **MEAGAN WOLFE, in her official capacity as the Administrator of the Wisconsin Elections Commission,** | **Case No. 3:24-cv-00285-JDP** |
| *Defendant.* | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
BRIEF OF THE UNITED STATES ON THE CONSTITUTIONALITY OF
SECTION 4(B)(2) OF THE NATIONAL VOTER REGISTRATION ACT**

## INTRODUCTION

The United States "intervened in this action to defend the constitutionality of the National Voter Registration Act [NVRA]," yet echoes Defendant's call for this case to be dismissed at the starting line, disregarding an unjustified and now obsolete conflict with the Constitution's federalist design. This conflict intrudes also on Wisconsinites' voting rights. (Doc. 26 at 1.) The weighty and novel questions presented here demand more than simply the consideration of the exemption's statutory origins. Rather, the Court must consider whether Congress may, under current conditions, require election transparency in some states, but not others. Under the Tenth Amendment and *Shelby County v. Holder*, 570 U.S. 529 (2013), the answer to that question is "no." The Constitution cannot allow a permanent regime of two separate classes of states—those that must comply with federal transparency obligations (among other obligations), and those that are forever exempted from transparency.

As the Supreme Court recently put it, "[t]he [NVRA] has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst*., 584 U.S. 756, 761 (2018). At issue here is the Public Disclosure Provision of the NVRA. It advances both purposes. The Public Disclosure Provision mandates transparency for "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). Courts have disagreed with the position that the transparency provision is "secondary," as the United States implies. (Doc. 26 at 22.)  Congress "decid[ed] transparency in how states determine voter eligibility—the vital bedrock of our electoral system—is generally *paramount*." *Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296, 307 (M.D. Pa. 2022) (emphasis added.). "Without such transparency, public confidence in the

essential workings of democracy will suffer." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). The Public Disclosure Provision's unique and expansive scope is deliberate because it is designed to protect the right that is "preservative of all rights"—the right to vote. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Congress designed the Public Disclosure Provision to shed light on *all* activities that determine who belongs and who does not belong on the voter rolls.

Yet, in Wisconsin, those determinations are made in the dark. Wisconsin is one of only six states that are exempt from the *entirety* of NVRA, including the transparency provisions, because of circumstances three decades old. The NVRA exempted from the federal law any state where on and continuously after August 1, 1994, (a date more than a year *after* the NVRA was signed into law), "all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office." 52 U.S.C. § 20503(b)(2) (hereafter, the "NVRA Exemption"). Now, individuals exercising transparency rights in states that since adopted the same exemption criteria can obtain the information, but those seeking to exercise such rights in Wisconsin still cannot. The question presented in this case is whether that contradiction "makes sense in light of current conditions." *Shelby County*, 570 U.S. at 553. The Foundation's Complaint plausibly alleges that it does not.

Rather than focus on this constitutional inconsistency, the United States focuses on the identity of the challenger. As the Supreme Court said: "Fidelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 564 U.S. 211, 222 (2011). Rather, where a private plaintiff has suffered an injury in fact, she may "object that her injury results from disregard of the federal structure of our Government." *Id*. at 225-26. The Foundation may

therefore invoke equal state sovereignty here because the unequal sovereignty denies information to the plaintiff. The plaintiff here is thus harmed.

The Foundation has standing because the Foundation plausibly alleges an informational injury that is causing additional adverse consequences. Further, the Foundation's Complaint plausibly alleges that Wisconsin's NVRA Exemption offends the equal sovereignty mandates articulated in *Shelby County* and also fails the Fourteenth Amendment's congruence and proportionality requirement.

The Foundation's Complaint also plausibly alleges that Wisconsin is violating the NVRA by denying access to public records, and that the NVRA preempts Wisconsin's Data Fees and exemption for year of birth information. (*See* Doc. 1 ¶¶ 158-178.) Just as *Shelby County v. Holder*, 811 F. Supp. 2d 424, 444 (D.D.C. 2011) and *Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221, 230 (D.D.C. 2008), were not decided on motions to dismiss, neither should this case. Congruence, proportionality, and changed circumstances rendering unequal treatment of states were at issue in both those cases. It is premature to dismiss this case with those issues lying at the heart of this case. For these and the reasons articulated in the Foundation's previous briefing on this Motion (Doc. 16), the Defendant's motion to dismiss should be denied.

## BACKGROUND

The Foundation set forth the relevant statutory background in its Opposition to the Defendant's Motion to Dismiss (Doc. 16 at 3-10) and will not repeat those statements here. However, the Foundation will address three arguments made by the United States regarding the relevant background in its brief.

First, the United States briefly summarizes three of the four purposes of the NVRA and emphasizes only one purpose. (Doc. 26 at 4 (quoting 52 U.S.C. § 20501(b)(2)). All four purposes are essential:

(1)     to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2)     to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3)     to protect the integrity of the electoral process; and,

(4)     to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).

Second, the Supreme Court has summarized the Act's objectives as two-fold: "increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted*, 584 U.S. at 761. The United States' Brief, again focuses primarily on one of the two objectives, arguing that "Congress's concerns about increasing voter registration and participation suffuse the NVRA." (Doc. 26 at 21.) True enough, but transparency is how Congress helps facilitate that purpose. In fact, Wisconsin *removes* hundreds of thousands of voters from the rolls each year. According to data provided by Wisconsin to the Election Assistance Commission, the state removed 643,975 registrants between 2020 and 2022. "2022 EAVA Data Brief: Wisconsin," Election Assistance Commission, *available at* https://www.eac.gov/sites/default/files/2023-10/2022_EAVS_Data_Brief_WI_508c.pdf. Ensuring that Wisconsin's removals are lawful is, in part, why the Public Disclosure Provision exists.

Third, both the Foundation and the United States reference the same concept from House Report 103-9: "The Committee believes that states which have implemented one or both of these

exceptions have lessened the impediments to registration which goes significantly beyond the requirements of the bill." H.R. Rep. No. 103-9 at 110 (1993). (*Compare* Doc. 26 at 5 *with* Doc. 16 at 7.) This language highlights that it was registration, or "motor voter" activities, that were in mind when the NVRA Exemption was discussed. Indeed, the United States offers no legislative history demonstrating that Congress considered transparency when drafting the NVRA Exemption.[1]

If Congress had confined the exemption to only "motor voter" requirements—such as not mandating the establishment of a motor vehicle office registration process—it would have been more congruent and proportional. Instead, Congress exempted states with EDR (as of August 1994) from the *entire* NVRA, which includes the Public Disclosure Provision. The thirty-year-old exemption makes even less sense now, when many states offer registration and voting on the same day. Circumstances have dramatically changed from 1994 as most of those states are not exempt and the Foundation can obtain public records there.

As it stands in 2024, the NVRA absolves Wisconsin from maintaining all voter list maintenance records for at least two years, making all voter list maintenance records public, and limiting records-production costs. *See* 52 U.S.C. § 20507(i)(1). These transparency provisions protect the right to vote, and the voter who is improperly removed, especially one residing overseas or on a warship at sea, suffers because Wisconsin need not comply with a federal law with which forty-four other states must.

---

[1] The Exemption is cold comfort for a military service member or overseas citizen who requests a ballot and discovers they have been improperly removed from the rolls. They will not be able to show up at the polls to vote nor be able to explore why they were improperly removed from the rolls using the transparency provisions at issue here.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

"Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the States." *Shelby County*, 570 U.S. at 544 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("*Northwest Austin*")) (emphasis in *Shelby County*). The Foundation's Complaint alleges that the NVRA Exemption violates this principle of equal state sovereignty because it treats six states— including Wisconsin —differently than other states with respect to transparency without adequate justification.[2]

The United States' Brief argues the NVRA Exemption is a permissible transgression of the foundational Constitutional principle required by the Supreme Court. The United States argues that "Congress authorized two alternative regimes—Polling Place EDR or the specific

---

[2] In a footnote, the United States sets forth what it believes the challenge is. (Doc. 26 at 7 n.2.) Of course, the United States cannot rewrite the Foundation's Complaint. Further, any concerns about the appropriate remedy are, at best, premature. Questions about a remedy cannot save an unconstitutional law.

In passing, the United States cites *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). There, the United States Supreme Court considered whether a "legislative-veto provision is severable from the remainder of the [Airline Deregulation Act of 1978]." *Id*. at 680. The Court considered several factors, including what it referred to as "[t]he final test, for legislative vetos as well as for other provisions, is the traditional one: the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." *Id*. at 685. This raises the question of whether the United States is arguing that Congress **would not** have enacted the NVRA but for the NVRA Exemption that only applies to a handful of states. The United States has not developed this argument and it makes no difference here, in any event.

requirements of the NVRA—and honored certain state legislative choices made prior to August 1, 1994." (Doc. 26 at 14.) The "alternative regimes" were nothing more than a Hobson's Choice, *i.e.*, one that is no choice at all. To avoid the NVRA's intrusion, states were required to sacrifice their sovereignty by implementing Congress's policy preference for polling place EDR. In other words, Congress required states to choose between a loss of sovereignty and a loss of sovereignty.

Regardless, the Constitution does not grant conditional equal sovereignty. And even where the Constitution grants Congress the power to override state legislative choices—as it does with the Elections Clause—Congress may not treat states differently without extraordinary justification. *See Shelby County*, 570 U.S. at 544 (explaining that the equal state sovereign principle "remains highly pertinent in assessing subsequent disparate treatment of States"). Congress may not transgress equal state sovereignty by merely deciding to do so under the Elections Clause.[3]

I.     **The Foundation Has Standing.**

The United States takes issue with the Foundation's reliance upon the equal state sovereignty principle because the Foundation "cannot assert the equal sovereignty rights of a state." (Doc. 26 at 8.) Admittedly, the Foundation is not asserting third party standing on behalf of a state. But that is not fatal. The Foundation is seeking to redress direct injuries to the Foundation itself. The Supreme Court has held that a private party may raise constitutional principles, including principles embodied in the Tenth Amendment, in actions seeking relief

---

[3] Does Congress have more power to violate equal state sovereignty under the enforcement clauses of the Civil War Amendments? Do the unique circumstances of the enactment of the Civil War Amendments tolerate a greater degree of transgression into equal sovereignty? These questions need not be answered at this stage but lurk in the relevant analysis.

from direct injury. The constitutional questions here may be asserted by a variety of plaintiffs. The Foundation has standing because its injury is caused by the constitutional transgression here.

In *Bond v. United States*, 564 U.S. 211 (2011), the Supreme Court considered "whether a person indicted for violating a federal statute has standing to challenge its validity on grounds that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States." *Id*. at 214. The Court answered that question "yes." *Id*. The United States' attempts to distinguish the *Bond* case fails.

In *Bond*, an *amicus* appointed to defend the contrary decision of the court of appeals claimed that "to argue that the National Government has interfered with state sovereignty in violation of the Tenth Amendment is to assert the legal rights and interests of States and States alone," which is forbidden by the "prudential rule" that a party "cannot rest his claim to relief on the legal rights or interests of third parties." *Id*. at 220 (citations omitted). "[N]ot so," ruled the Supreme Court. *Id*. "The individual, in a proper case, can assert injury from governmental action taken in excess of the authority that federalism defines. Her rights in this regard do not belong to a State." *Id*.

The Supreme Court provides the authority for the Foundation's standing: "[W]here the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from disregard of the federal structure of our Government." *Id*. 225-26. That is precisely the case here. The Foundation's injury, or case, is premised on a violation of the NVRA. That injury "results from disregard of the federal structure of our Government," *id*., namely, the equal state sovereignty principle. The Foundation's harm stems from exempting Wisconsin from a federal transparency obligation. It makes no difference that the Foundation "is

not invoking the equal sovereignty principle to alleviate federal burdens….” (Doc. 26 at 12.) The

diversion from principles of federalism is what is at issue.

Under *Bond*, the Foundation may invoke that principle to secure relief for its statutory

injury. *See also Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (citing *Bond* with

approval); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 703 (7th Cir. 1999) (“Gillespie, in

making Tenth Amendment claims, actually is asserting his own rights.”)

> The limitations that federalism entails are not therefore a matter of rights belonging
> only to the States. States are not the sole intended beneficiaries of federalism.
> *See New York*, *supra*, at 181, 112 S. Ct. 2408, 120 L. Ed. 2d 120. An individual has
> a direct interest in objecting to laws that upset the constitutional balance between
> the National Government and the States when the enforcement of those laws causes
> injury that is concrete, particular, and redressable. **Fidelity to principles of
> federalism is not for the States alone to vindicate.**

*Bond*, 564 U.S. at 222 (emphasis added).

The United States tries to restrain *Bond* inappropriately. (*See* Doc. 26 at 10-12.) *Bond* is

not limited to situations where the government has “enforced” an invalid law against the

plaintiff, much less an invalid *criminal* law. (*See id*. at 12.) *Bond* is much broader: “If the

constitutional structure of our Government that protects individual liberty is compromised,

individuals who suffer otherwise justiciable injury may object.” *Bond*, 564 U.S. at 223.

Indeed, government can cause justiciable injury multiple ways, not simply with

prosecutorial acts or targeted enforcement. What matters is not the “type of harm”—as the

United States believes (Doc. 26 at 10)—but whether the harm is otherwise “justiciable,” *Bond*,

564 U.S. at 223. Here, the Foundation’s informational injury (and its adverse effects) is

justiciable under well-settled jurisprudence regarding informational injuries. (*See* Doc. 1 ¶ 127.)

The United States argues nothing to the contrary.

To the extent enforcement matters, that requirement is also met here. The Defendant is enforcing an express statutory exemption (*i.e.*, 4(b)) to deny the Foundation's records request.

## II.   Wisconsin's Exemption from the Public Disclosure Provision Violates the Principle of Equal State Sovereignty.

The United States' suggestion that the equal state sovereignty principle began and ended with *Shelby County* is wishful thinking. (Doc. 26 at 14-15.) Equal state sovereignty is not just a product of one single Supreme Court case that the United States lost making similar arguments it is making here. Equal sovereignty is a foundational part of the adoption of the Constitution. As the Supreme Court explains, "'[T]he constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized.'" *Shelby County*, 570 U.S. at 544 (citing *Coyle v. Smith*, 221 U.S. 559, 580 (1911)). Equal sovereignty is a foundational principle, not a fluke.

The Supreme Court has applied the equal state sovereignty principle in various contexts—not only to laws adopted under Fifteenth Amendment enforcement powers. *See*, *e.g.*, *Coyle*, 221 U.S. at 567 (determining that Oklahoma had the authority to change the location of its capital as the nation "is a union of States, equal in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself."); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980) (noting that the "concept of minimum contacts" in a personal jurisdiction analysis "acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.") Equal state sovereignty is in the constitutional architecture of the federalist design. It cannot be wished away.

A.       The Public Disclosure Provision.

Congress mandated disclosure of "all records" concerning voter list maintenance, 52 U.S.C. § 20507(i)(1). *Project Vote*, 682 F.3d at 336 (interpreting the NVRA's Public Disclosure Provision and explaining, "[T]he use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth") (citations omitted.) In the words of the First Circuit, the Public Disclosure Provision "evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA." *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024).

In recent Courts of Appeals cases involving the Public Disclosure Provision, the United States supported the central importance of the Public Disclosure Provision. Before the First Circuit, the United States argued:

> Congress enacted the NVRA to "provide uniform national voter registration procedures for Federal elections." Senate Report 3. By doing so, Congress stated in the NVRA's text, it aimed both to expand voter registration and to protect the integrity of the electoral process. See 52 U.S.C. 20501(b). Because it often is necessary to use or disseminate disclosed data to fulfill these twin purposes, States may not condition Section 8(i)'s disclosure right on compliance with overbroad use or dissemination restrictions. See *Felder*, 487 U.S. at 153. For similar reasons, one also may view Section 8(i)'s disclosure right as carrying with it additional "implicit federal right[s]," *Maine Forest Prods. Council*, 51 F.4th at 10, to use and disseminate the disclosed information as needed to fulfill the NVRA's purposes.

Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellee Urging Certification or Affirmance on the Issues Addressed Herein at 23-24, *Public Interest Legal Foundation v. Bellows*, No. 23-1361 (1st Cir. July 25, 2023).

Before the Third Circuit, the United States argued:

> Whether "voter registration rolls" are "accurate and current," 52 U.S.C. 20501(b)(4), can only be determined by examining records related to *all* the bases on which a State removes registrants. At the same time, public inspection of records related to removals—whatever the reason for them—ensures that States are engaging in uniform and nondiscriminatory list-maintenance practices. *See* 52

U.S.C. 20507(b)(1). Identifying errors in States' voter registration systems promotes a smoother registration process, which is vital to "enhanc[ing]" voter "participation," while also "protect[ing] the integrity of the electoral process" by ensuring that ineligible individuals are excluded from the rolls. *See* 52 U.S.C. 20501(b)(2)-(3). Plus inspection of all registration and list-maintenance records helps to uncover systemic problems in a jurisdiction, so voters or organizations can remedy registration or list-maintenance issues and re-register improperly removed voters before future elections. *See*, *e.g.*, *Project Vote*, 682 F.3d at 333; *see also* 52 U.S.C. 20501(b)(1)-(2). Public disclosure of the records of the Secretary's investigation thus advances the NVRA's central purposes.

Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellee-Cross-Appellant and Urging Affirmation on the Issue Addressed Herein at 22-23, *Public Interest Legal Foundation v. Secretary of the Commonwealth of Pennsylvania*, Nos. 23-1590 & 23-1591 (3rd Cir. Nov. 06, 2023). *See also* Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellee and Urging Affirmation on the Issues Addressed Herein, *Greater Birmingham Ministries v. Secretary of State for State of Alabama*, No. 22-13708 (11th Cir. March 20, 2023). The Public Disclosure Provision is not a junior provision of the NVRA. It advances the purposes of the NVRA—all of them.

**B.    The United States Supreme Court Requires Any "Departure from the Fundamental Principle of Equal Sovereignty" Be "Sufficiently Related to the Problem that it Targets."**

Consider the Supreme Court's application of the principle of equal state sovereignty related to the Voting Rights Act (VRA), 52 U.S.C. § 10101 *et seq*. Recall that VRA Section 5 required federal preclearance before any state election practice or procedure related to voting could go into effect. VRA Section 4 transgressed on equal state sovereignty by subjecting some states to preclearance—any state that used a forbidden test or device in November 1964 and had less than 50 percent voter registration or turnout in the 1964 Presidential election—but not others. 52 U.S.C. § 10303(b).

Unlike the NVRA Exemption, the VRA Section 4's coverage formula was not static. Covered jurisdictions could "bailout" of Section 5's federal preclearance requirement by seeking a declaratory judgment from a three-judge panel in United States District Court for the District of Columbia. *See* 52 U.S.C. § 10303(a)(1). The VRA also contained a provision under which jurisdiction could be "bailed in" to the federal preclearance requirement for committing violations of the Fourteenth or Fifteenth Amendments. 52 U.S.C. § 10302(c). The VRA was not stuck in the past, and unlike the NVRA, had a measure of elasticity. As we shall see, even this elasticity was not enough to save the law from violating equal sovereignty.

In 2009, the United States Supreme Court considered an action brought by a jurisdiction seeking relief from Section 5's federal preclearance requirement under the VRA's "bailout" provision. *Northwest Austin*, 557 U.S. 193. Alternatively, the municipal utility district challenged the constitutionality of the preclearance requirements. *Id*. at 197. The Court acknowledged that the VRA "differentiates between the States, despite our historic tradition that all the States enjoy 'equal sovereignty.'" *Id*. at 203 (citing *United States v. Louisiana*, 363 U.S. 1, 16 (1960)). While "[d]istinctions can be justified in some cases," the Supreme Court explained, "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Id*. at 203. Specifically, "the Act imposes current burdens and must be justified by current needs." *Id*. The ability to bail out of the VRA's disparate burdens had significant import with the Supreme Court. Again, elasticity is absent from the NVRA.

Four years after this opinion—and just seven years after Congress reauthorized Section 5 with a voluminous Congressional record—in *Shelby County*, the Supreme Court held that VRA Section 4 was unconstitutional. The Court reaffirmed "the principle that all States enjoy equal

13

sovereignty." 570 U.S. at 535. *See also id*. at 544 ("[T]he constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized.") (citations and quotations omitted). The Supreme Court instructed, with respect to a law that treats the States differently, "a statute's 'current burdens' must be justified by 'current needs,' and any 'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'" *Id*. at 550-51 (citing *Northwest Austin,* 557 U.S. at 203).

The United States argues that the equal sovereignty principle is limited "to Congress's Fifteenth Amendment power—not its Article I powers." (Doc. 26 at 14-15.) Unfortunately for the United States, it may be quite the opposite, namely that the Fifteenth Amendment provides Congress the widest leeway to violate equal sovereignty and the Elections Clause provides none. Regardless, whichever basis in the Constitution for the challenged statute, *Shelby County* makes clear that the equal sovereignty requirement is not so limited. It was not the VRA or its constitutional source that necessitated the outcome in *Shelby County*; it was the equal state sovereignty principle. *See Shelby County*, 570 U.S. at 553 ("Congress—if it is to divide the States—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions. It cannot rely simply on the past. We made that clear in *Northwest Austin*, and we make it clear again today.").

The Court in *Shelby County* repeatedly emphasized that the VRA was "extraordinary," 570 U.S. at 536, because it disparately intruded on states' power to regulate elections, "sensitive areas of state and local policymaking," *id*. at 545 (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)), which "the Framers of the Constitution intended the States to keep for themselves," *id*. at 543 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461-462 (1991)).

14

The NVRA also intrudes into states' power to regulate elections, elections being the activity at the heart of reserved state powers. This is a key distinction from distinguishable cases referenced by the United States. *See Mayhew v. Burwell*, 772 F.3d 80, 95-96 (1st Cir. 2014) ("A state's ability to set the conditions of eligibility for participation in a federal health insurance program that is funded primarily by the federal government is not a core sovereign state function in the same way as is a state's ability to regulate the conduct of its elections."); *New York v. Yellen*, 15 F.4th 569, 584 (2d Cir. 2021) ("Here, as explained, the SALT deduction cap has no effect on state sovereignty. The outsized effect of the SALT deduction cap on the Plaintiff States arises only because the Plaintiff States previously benefitted most from the SALT deduction, not because the cap applies to some States but not others."); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018).

"Elections Clause legislation is unique precisely because it *always* falls within an area of concurrent state and federal power…. even laws enacted under the Commerce Clause (arguably the other enumerated power whose exercise is most likely to trench on state regulatory authority) will not always implicate concurrent state power…." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 n.6 (2013). Elections Clause legislation is an entirely different animal from broad economic policies or other Article I legislation.[4]

---

[4] The United States asserts that disparate treatment of the states under the Elections Clause might be necessary in the event that "threats or abuses" to federal elections "come only from certain states." (Doc. 26 at 18 n.9.) This Court is not presented with such a scenario and need not consider whether Congress would be justified under *Shelby County* in an imagined set of facts.

**C.      Wisconsin's Exemption from the Public Disclosure Provision Is Not Justified Under Current Conditions.**

In 2024, many states have same day registration and polling place EDR, yet they are not exempted from the NVRA. This contradiction illustrates that even if something made sense in 1994, it is no longer justified under current conditions.[5]

The Foundation's Complaint alleges that the NVRA Exemption departs from the equal state sovereignty because it treats six states—including Wisconsin—differently than other states with respect to transparency without adequate justification. The United States asserts that "each state retained equal sovereignty" (Doc. 26 at 20) because each state was given a short window to choose EDR, what Congress itself thought was "[t]he most controversial method of registration," 103 H. Rpt. 9, or be subject to extensive federal legislation for all time. At best, this was a choice between a loss of sovereignty by enacting Congress's preference for polling place EDR or a loss of sovereignty by making themselves subject to the entire NVRA. In neither instance, could a state retain its sovereignty. Worse, even a state that once qualified for the Exemption can lose it. Once lost, the state can never get it back. *See*, *e.g.*, *New York v. Yellen*, 15 F.4th at 584 ("'Congress may use its spending power to create incentives for States to act in accordance with federal policies,' as long as 'pressure [does not] turn[] into compulsion.'") (citations omitted).

That situation is not hypothetical. It is Maine's story. The NVRA House Report touted that "Maine, Minnesota and Wisconsin allow a form of 'same day' registration, and they rank among the top states in the percent of eligible voters registered." 103 H. Rpt. 9. But, in 2011, the

---

[5] The United States, three times, cites a statement from a Senator who was opposed to extending the deadline for states to qualify for the exemption. According to the Senator, "[t]his would encourage States to adopt same day registration procedures as a means of escaping the bill's requirements…. This a curious amendment with a ridiculous result." 41 Cong. Rec. 27070-71 (1995) (statement of Sen. Ford).

Maine Legislature changed the law to require registration by "the 3rd business day before election day…." "An Act To Preserve the Integrity of the Voter Registration and Election Process," PUBLIC Law, Chapter 399, LD 1376, 125th Maine State Legislature. In November of that same year, "[b]y a relatively wide margin," the people of Maine voted to overturn the law. Eric Russell, *Mainers vote to continue Election Day Registration*, Bangor Daily News (Nov. 8, 2011), *available at* https://www.bangordailynews.com/2011/11/08/politics/early-results-indicate-election-day-voter-registration-restored/. Maine had same day registration at the passage of the NVRA and has it now. Because Maine did not have it *continuously* in between, even for only a moment in time, it *is* subject to all parts of the NVRA. The First Circuit recently held that Maine violated the NVRA by not disclosing the same document sought here, the voter roll, pursuant to the NVRA's Public Disclosure Provision. *See Bellows*, 92 F.4th at 49.

Even if the NVRA allowed states to choose whether they were subject to the NVRA, that does not save the NVRA Exemption. Recall, the VRA included a mechanism that allowed it to adapt to current conditions—by bailing in or bailing out of the preclearance requirement. Yet the Supreme Court struck it down in *Shelby County*. Unlike the VRA, the NVRA has no such mechanism. At most, states can check in, but they can never leave. The NVRA Exemption violates equal state sovereignty.

The NVRA's "current burdens" are not justified by "current needs." *Shelby County*, 570 U.S. at 550 (citation omitted). Forty-four states are burdened by a loss of sovereignty and by compliance with the Public Disclosure Provision. Wisconsin is not. In Wisconsin, the NVRA's legislative purpose of ensuring transparency and oversight in the voter list maintenance process is dead. Importantly, the EDR process is not immune from discriminatory application, inefficiency, error, or mistake. Voters trying to register to vote in Wisconsin may still be denied

registration. Yet in Wisconsin, improper denials of the right to vote will be done in the darkness, without the right to discern why they happened through record requests. According to the Fourth Circuit:

> It is selfevident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls. State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer.

*Project Vote*, 682 F.3d at 339. Because the NVRA exempts a state where the "problem" is equally pervasive, the "disparate geographic coverage" is not "sufficiently related to the problem that the [NVRA] targets." *Shelby County*, 570 U.S. at 551 (citation omitted).

Congress identified the other problems it targeted with the NVRA. *See* 52 U.S.C. § 20501(a)-(b) (NVRA findings and purposes). The Act's purposes include eliminating discriminatory registration practices, increasing registration rates, and maintaining election integrity. Courts have found that the Public Disclosure Provision is a means to achieve these other purposes with oversight and accountability. *See Bellows*, 92 F.4th at 54.

Circumstances have radically changed since 1994 as it relates to Election Day Registration. EDR—the original and sole condition for the NVRA Exemption—has burst out far beyond exempt states. The United States concedes that thirteen states and the District of Columbia have Polling Place EDR. (Doc. 26 at 25 n. 14.) Yet, these states, including California, Hawaii, Illinois, Iowa, Maryland, Nevada, Utah, Vermont, Virginia, and the District of Columbia must comply with the NVRA. Under "current conditions," the NVRA's disparate treatment does not "make[] sense." *Shelby County*, 570 U.S. at 553. Even if the NVRA Exemption was justified

in 1994, it cannot be sustained under "current conditions."[6] Wisconsin currently has an equal need for transparency in the voter list maintenance process, and Congress's other findings (52 U.S.C. § 20501(a)) and the NVRA's other purposes (52 U.S.C. § 20501(b)) are equally relevant in Wisconsin today.

## III.    Wisconsin's Exemption from the Public Disclosure Provision Violates the Fourteenth Amendment's Congruence and Proportionality Requirement.

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that when Congress enforces the Fourteenth Amendment through legislation, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id*. at 520.

The United States concedes that "the NVRA is also a proper exercise of Congress's authority to enforce the Fourteenth and Fifteenth Amendments' constitutional prohibitions on discrimination in voting" (Doc. 26 at 29), yet argues that this Court need not consider this portion of the Foundation's Complaint "in light of Congress's preemptive authority under the Elections Clause," (Doc. 26 at 28). The Foundation's Complaint properly alleges that Wisconsin's NVRA Exemption lacks the required "congruence and proportionality." This allegation is plausible because the enforcement regime is no longer congruent with the current circumstances of EDR adoption and is wildly disproportionate to the harms Congress sought to fix. (*See* Doc. 1 ¶¶ 76-83.)

---

[6] Notably, although the First Circuit in *United States v. Diggins*, 36 F.4th 302, 316 (1st Cir. 2022) declined to extend *Shelby* to a Thirteenth Amendment claim, it noted "even if *Shelby County* can be read to impose a general obligation on Congress to update civil rights laws to account for current conditions, we see no issue with § 249(a)(1). Congress adopted the law after looking at conditions in 2009, which it found were broadly consistent with historical data." *Id*. at 316.

Whether a challenged statute is congruent and proportional is ill-suited for a dismissal of a complaint under Rule 12. Congruence and proportionality requirements ask whether a particular statute is properly crafted and does not tread into disproportional enforcement regimes. The Foundation has plausibly pleaded that the exemption scheme is neither congruent nor proportional, and the motion to be dismiss should be denied, and any defenses related to this be reserved for the later stages of this case.

Imagine election officials refusing to process registration applications for students at a historically black college or university and refusing to provide the records that were part of the decision to deny voter registration. Those were the facts in *Project Vote v. Long*. *See Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 699 (E.D. Va. 2010). An advocacy group used the Public Disclosure Provision to compel election officials to produce those records. *See id* at 700. That would not be possible in Wisconsin, even though the same risk of discrimination exists—even in the EDR process. The required "congruence and proportionality" between the remedy sought and means adopted is thus lacking. *City of Boerne*, 521 U.S. at 520.

The Public Disclosure Provision was designed, in part, to shed light on activities that might deny the right to vote or discriminate on the basis of race. Yet those protections are not afforded to the citizens of Wisconsin or the other exempt states. Congress has "no power" to "dilute" the Fourteenth Amendment's equal protection guarantees in this way. *See Katzenbach v. Morgan*, 384 U.S. 641, 651 n.10 (1966). A law premised on equal protection, but which does not protect equally, cannot be considered "consistent with the letter and spirit of the constitution." *Id*. at 651 (citations and quotations omitted).

The Foundation has properly alleged that Wisconsin's exemption from the NVRA's Public Disclosure Provision violates the principle of congruence and proportionality, and it is therefore invalid. (*See* Doc. 1 ¶ 83.)

## CONCLUSION

Wisconsin's NVRA Exemption is no longer justified. The Court should so rule and deny Defendant's motion to dismiss.

Dated: October 7, 2024.

For the Plaintiff Public Interest Legal Foundation:

<div style="margin-left:40%;">

CRAMER MULTHAUF LLP
Attorneys for Plaintiff,

BY: *Electronically signed by Matthew M. Fernholz*
    MATTHEW M. FERNHOLZ
    (State Bar No. 1065765)

</div>

CRAMER MULTHAUF LLP
1601 East Racine Avenue • Suite 200
P.O. Box 558
Waukesha, WI 53187-0558
(262) 542-4278
mmf@cmlawgroup.com

<div style="margin-left:40%;">

  /s/ Kaylan L. Phillips
Noel H. Johnson* (Wisconsin Bar #1068004)
Kaylan L. Phillips* (Indiana Bar #30405-84)
Public Interest Legal Foundation, Inc.
107 S. West Street, Suite 700
Alexandria, VA 22314
Tel. (703) 745-5870
njohnson@PublicInterestLegal.org
kphillips@PublicInterestLegal.org
*Admitted pro hac vice*
*Attorneys for Plaintiff Public Interest Legal Foundation*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2024, I electronically filed the foregoing using the

Court's ECF system, which will serve notice on all parties.


       /s/ Kaylan L. Phillips
Kaylan L. Phillips
kphillips@publicinterestlegal.org
*Counsel for Plaintiff*