IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PUBLIC INTEREST LEGAL FOUNDATION, INC.,

               Plaintiff,

   v.

MEAGAN WOLFE, in her official capacity as the
Administrator for the Wisconsin Elections Commission,
and THE UNITED STATES,

               Defendants.

OPINION and ORDER

24-cv-285-jdp

---

Plaintiff Public Interest Legal Foundation, Inc. is a nonprofit organization that describes its purpose as "promot[ing] the integrity of the electoral process nationwide." Dkt. 1, ¶ 5. One of the ways it does this is to "determine whether lawful efforts are being made to keep voter rolls current and accurate." *Id.*[1]

The foundation is suing the administrator of the Wisconsin Elections Commission, contending that she is violating the National Voter Registration Act of 1993 (NVRA) by refusing to provide Wisconsin's official voter registration list at a reasonable cost and by excluding from its list the year of each voter's birth. The foundation acknowledges that states like Wisconsin that have allowed same-day registration at the polls since the NVRA was passed are exempt from the disclosure requirements in the statute. *See* 42 U.S.C. § 20503(b)(2). But the foundation says that the exemption is unconstitutional, so the court should require the

---

[1] The foundation provides an example on its website: "We have compiled the voter rolls from across the country into a database that allows us to know who is voting twice or from beyond the grave. We've used this data to sue states for failing to do effective list maintenance such as not removing deceased registrants, duplicate voter registrations, and voters who move to another state." https://publicinterestlegal.org/issues/voter-roll-error-map/.

administrator to comply with the disclosure requirements that apply to other states. The administrator moves to dismiss on multiple grounds. Dkt. 14. The United States has intervened under 28 U.S.C. § 2403 to defend the constitutionality of § 20503(b)(2). Dkt. 22.

The foundation's claim is a novel one. The foundation identifies no case in which a court granted a party's request to invalidate one provision of a statute so that it can enforce another provision of the same statute.[2] The court concludes that the claim fails as a matter of law.

The foundation relies primarily on the principle of the states' "equal sovereignty" that the Supreme Court discussed in *Shelby County, Alabama v. Holder*, 570 U.S. 529, 553 (2013), and it contends that the exemption granted to Wisconsin violates that principle because Congress does not have adequate justification for treating Wisconsin differently from other states. But *Shelby* was about unwarranted *burdens* on states in violation of the Tenth Amendment. *Shelby* did not invalidate a state *exemption*, which is what the foundation is seeking. If *Shelby* were to apply to the NVRA, it would mean that the entire statute is unconstitutional because it unduly interferes with the sovereignty of some states. But the foundation is seeking the opposite of that: it wants to expand the scope of the NVRA to cover more states. The foundation cites no example of a court that relied on federalism principles to impose new burdens on a state in the name of "equal sovereignty."

Even if the principle of "equal sovereignty" could invalidate a state exemption, the court concludes that *Shelby* does not apply to the NVRA. *Shelby* involved an unusually burdensome

---

[2] The parties discuss one other case in which the foundation is asserting the same claim in Minnesota that it is asserting in this case. *See Public Interest Legal Foundation, Inc. v. Simon*, No. 24-cv-1561 (D. Minn. filed Apr. 30, 2024). The defendant's motion to dismiss that case is pending.

statute that severely intruded into traditional areas of state sovereignty and stigmatized a subset of states by implying that they could not be trusted to refrain from discriminating on the basis of race without federal supervision. In contrast, the NVRA imposes modest requirements related to the time, place, and manner of holding federal elections, something that Congress controls under the Elections Clause. The NVRA gave all states the opportunity to qualify for an exemption by offering same-day voter registration. So *Shelby* bears no resemblance to this case. The NVRA is no different from "countless federal laws whose benefits and burdens are unevenly distributed across the country and among the several States." *New York v. Yellen,* 15 F.4th 569, 584 (2d Cir. 2021).

The foundation stretches *Shelby* well past the breaking point. It identifies no other court that has interpreted *Shelby* in the matter it proposes. The foundation's claim is not supported by law or logic, so the court will grant the administrator's motion to dismiss.

## BACKGROUND

The Constitution directs the states to set "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. Art. I § 4, cl. 1. But the same provision gives Congress the authority to "make or alter such Regulations." *Id.* A different clause gives Congress the same authority over Presidential elections. U.S. Const. Art. II, § 1; *Association of Community Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995). Pursuant to that authority, Congress enacted the NVRA. *ACORN*, 56 F.3d at 793; *Common Cause Indiana v. Lawson*, 937 F.3d 944, 947 (7th Cir. 2019). The law imposes various requirements on the states regarding voter registration in elections for federal office. *Arizona v.*

*Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 5 (2013); *Young v. Fordice*, 520 U.S. 273, 275–76 (1997). Some of these requirements include the following:

- allowing voter registration at motor vehicle agencies, at government offices, and through the mail, 52 U.S.C. §§ 20503–20506;

- allowing registration within 30 days of an election, *id.* § 20507(a)(1); and

- making reasonable efforts to remove ineligible voters from registration lists, and restricting when voters can be removed from those lists, *id.* § 20507(a)(4),(d).

Relevant to this case, the NVRA also requires states to maintain public access of their voter registration list:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

*Id.* § 20507(i)(1).

These requirements reflect two main purposes of the NVRA: to increase voter registration and to maintain accurate registration lists. *See Husted v. A. Philip Randolph Institute,* 584 U.S. 756, 761–62 (2018) (citing 52 U.S.C. § 20501(b)). Any person who is aggrieved by a violation of the NVRA may sue the state's chief election official if the official does not correct the violation after receiving notice of it. 52 U.S.C. § 20510(b).

There are important exceptions to the NVRA's requirements. For example, a state need not comply with the NVRA if that state allows a voter to register at the polling place on election day, so long as the state has allowed that continuously since the NVRA went into effect in 1994. *Id.* § 20503(b)(2). Committees in the Senate and House of Representatives concluded

that states allowing same-day registration "have lessened the impediments to registration which goes significantly beyond the requirements of the bill," so an exemption is appropriate. S. Rep. No. 103-6 (1993); H.R. Rep. 103-9 (1993).[3] The parties agree that Wisconsin has allowed same-day registration continuously since 1994, so it qualifies for the exemption. Wis. Stat. § 6.55 (allowing for same-day voter registration). Five other states also qualify for an exemption: North Dakota, Minnesota, Wyoming, Idaho, and New Hampshire. Brief for the United States, Dkt. 26, at 14.

In January 2024, the foundation asked the Wisconsin Election Commission for the most recent copy of Wisconsin's official voter registration list, including each voter's year of birth. Dkt. 1-1. The foundation offered to "pay a reproduction fee not to exceed the cost of reproduction," and it cited the NVRA as the basis for its request. *Id.* In February 2024, the commission informed the foundation that it was exempt from the NVRA, so it was treating the foundation's letter as an open records request under state law. Dkt. 1-2. The commission directed the foundation to an online portal, https://badgervoters.wi.gov, where the foundation could obtain Wisconsin voter data for a fee of $5 for every 1,000 voters, with a cap of $12,500. *Id.*; Wis. Admin. Code § EL 3.50(4). In a follow-up letter, the foundation accused the commission of violating the NVRA because the cost of obtaining information through the portal was not tied to reproduction costs and because each voter's year of birth was not included in the information that could be obtained through the portal. Dkt. 1-3. The foundation contended that Wisconsin's exemption was "ineffective" under Supreme Court precedent, and

---

[3] According to Senator Mitch McConnell, the exemption did not apply to states who allowed same-day registration after 1994 because of a concern that the exemption would be a "backdoor means of forcing states into adopting election day registration." 139 Cong. Rec. 9632 (1993).

it threatened a lawsuit if the commission did not comply. *Id.* In response, the commission again informed the foundation that it was exempt from the NVRA. Dkt. 1-4.

The foundation filed this lawsuit in April 2024.

ANALYSIS

## A.  Overview of the claims and defenses

The foundation contends that the administrator has violated the NVRA in three ways: (1) she has failed to provide an electronic copy of Wisconsin's official voter registration list; (2) she has not provided "year of birth information" for each voter on the list; and (3) she is charging the foundation $12,500 for the list, which is unreasonable because it exceeds the cost of reproduction. The foundation cites § 20507(i)(1), which requires states to make their voter registration lists available to the public "at a reasonable cost." The foundation asks for a declaration that the administrator is violating the NVRA and an injunction requiring her to produce the requested the information "without first playing costs the NVRA does not authorize." Dkt. 1, 28–29.

The foundation acknowledges a significant roadblock in its path: by its own terms, the NVRA does not apply to Wisconsin. *See* 52 U.S.C. § 20503(b)(2). To get around this problem, the foundation contends that the exemption is unconstitutional under the principles articulated in *Shelby County, Alabama v. Holder*, 570 U.S. 529 (2013), and *City of Boerne v. Flores*, 521 U.S. 507 (1997). Specifically, the foundation contends that the exemption violates the "equal sovereignty" principle articulated in *Shelby* because it treats states differently without adequate justification, and it is not a valid exercise of congressional authority because it violates the "congruence and proportionality" principle articulated in *Boerne.* If the exemption is

6

unenforceable, the argument goes, then the requirements in the NVRA apply to Wisconsin, and the court must compel the administrator to comply.

Neither the administrator nor the government contend that the online portal offered by Wisconsin satisfies the requirements of the NVRA. But both parties raise other challenges to the foundation's claims that can be grouped into three categories: (1) the foundation does not have standing to sue; (2) neither *Shelby* nor *Boerne* apply to this case; and (3) the NVRA is valid under *Shelby* and *Boerne*.

On a motion to dismiss, the question is whether the complaint includes plausible allegations showing that the plaintiff is entitled to relief. *See* Fed. R. Civ. 8; *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). A similar standard applies to the question of standing. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015).

The court concludes that the foundation has standing but that neither *Shelby* nor *Boerne* apply to this case. So the court need not decide whether the NVRA satisfies the tests in *Shelby* and *Boerne* as the foundation understands them. The court will begin with the question of standing.

## B.  Standing

A party has standing to sue under Article III of the U.S. Constitution if the party has suffered or will likely suffer an injury that is concrete and particularized, fairly traceable to the challenged conduct of the defendant, and likely to be redressed if the lawsuit is resolved in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In this case, the foundation's asserted injury is that the administrator is withholding information. A failure to obtain information required to be disclosed under law is a concrete and particularized injury. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998); *Carello v. Aurora Policemen Credit Union*,

930 F.3d 830, 835 (7th Cir. 2019). The foundation's injury is fairly traceable to the administrator because she is refusing to provide the information under the foundation's requested terms. If the foundation prevailed in this lawsuit, it would be entitled to the information it is seeking, so the injury is redressable.

Only the administrator contends that the foundation lacks Article III standing, and only in her reply brief. She says that the foundation did not suffer an informational injury because the NVRA does not require Wisconsin to disclose any information. The administrator raises a fair point. The foundation points to no other instance in which a party was able to satisfy the injury requirement by trying to invalidate a portion of the same statute that it contends the defendant is violating. But when the court evaluates standing, the court "must . . . assume that on the merits the plaintiffs would be successful in their claims." *Sierra Club v. U.S. E.P.A.*, 774 F.3d 383, 389 (7th Cir. 2014) (internal quotation marks omitted). If the foundation were successful in eliminating the exemption, the NVRA would require the administrator to disclose information to the foundation. So the court concludes that the foundation has standing under Article III.

The government asserts an argument about *prudential* standing, though it does not use that term. Specifically, the government invokes the prudential limitation regarding "third-party standing": a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotation marks omitted). The government says that the foundation's challenge to the constitutionality of the exemption provision is based on an assertion that the provision treats some *states* differently from others, so that contention should be raised by a state, not a private litigant. The government acknowledges that the Supreme

Court recognizes third-party standing when "the party asserting the right has a 'close' relationship with the person who possesses the right," and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130. But the government says that the foundation cannot meet either of these requirements.

The foundation does not contend that it can meet the requirements for third-party standing articulated in *Kowalski*. Instead, it contends that it is entitled to assert its constitutional challenge under *Bond v. United States*, 564 U.S. 211 (2011), and *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999). Those cases involved individuals contending that a federal criminal statute violated the federalism principles embodied in the Tenth Amendment, which states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. const. amend. X.

In both *Bond* and *Gillespie*, the government litigants argued that states, not individuals, must raise federalism arguments, and, in both cases, the courts rejected the argument. In *Bond*, the Court stated that "[a]n individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." 564 U.S. at 222. In *Gillespie*, the court made a similar observation that the Tenth Amendment "ultimately secures the rights of individuals," so the plaintiff could rely on the amendment to challenge a federal statute, so long as he was suffering from a concrete injury that could be traced to the challenged statute and would be redressed if the statute was invalidated. 185 F.3d at 703. In neither case did the court consider the limitations for third-party standing identified in *Kowalski*; rather, the courts in both cases appeared to assume that the individual does not need a "close" relationship

with the state because an individual being harmed by an unconstitutional statute is not really a third-party but instead is asserting her own interests.

As the government points out, this case does not involve a criminal penalty like *Bond* and *Gillespie* did. But neither *Bond* nor *Gillespie* stated that their holdings were limited to the criminal context. Rather, the principle in both cases appears to be that an individual may challenge a statute on federalism principles, so long as they have standing under Article III. This court has concluded that the foundation has Article III standing, so it follows that the foundation may challenge the exemption provision on federalism grounds. In any event, third-party standing is not jurisdictional. *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 688-89 (7th Cir. 2015). The court concludes that the foundation's claims fail on other grounds, so it is not necessary to decide whether there are prudential reasons for declining to consider the foundation's claim.

## C. *Shelby* and *Boerne*

The foundation's argument that the exemption provision is unconstitutional rests on two cases, *Shelby County, Alabama v. Holder*, 570 U.S. 529 (2013), and *City of Boerne v. Flores*, 521 U.S. 507 (1997). *Shelby* involved the preclearance provision in the Voting Rights Act, which required some states and counties to obtain permission from the federal government before enacting any laws related to voting. 570 U.S. at 534–35. Those jurisdictions were required to prove that any proposed change "had neither the purpose nor the effect of denying or abridging the right to vote on account of race or color." *Id.* at 537 (internal quotation marks omitted).

The question before the Court was whether the preclearance provision was justified under the Fifteenth Amendment, which prohibits discrimination in voting because of race and

gives Congress the authority to "enforce" the amendment. The Court had previously upheld the preclearance provision multiple times as a valid exercise of power under the Fifteenth Amendment. *See, e.g., South Carolina v. Katzenbach*, 383 U.S. 301 (1966); *City of Rome v. U.S.*, 446 U.S. 156 (1980). But in *Shelby*, the Court concluded that the original justification for the provision—combatting racial discrimination in voting in jurisdictions with a long history of such discrimination—was no longer adequate because now there was little difference between Black and White rates of voter registration and turnout in the covered states. *Shelby*, 570 U.S. at 547–48, 551. In the Court's view, the "current burdens" imposed on some states were not justified by "current needs," so the preclearance provision was unconstitutional. *Id.* at 550–51, 553, 557. In reaching this conclusion, the Court repeatedly emphasized the "extraordinary" nature of the preclearance provision, in terms of the intrusion on state sovereignty and the burdens imposed on the covered states. *Id.* at 534, 544, 545, 549, 552, 555.

*Boerne* was about the constitutionality of the Religious Freedom Restoration Act (RFRA) as applied to the states. RFRA made it unlawful for the states to impose a substantial burden on religious exercise unless that burden was the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1. Congress's asserted authority for enacting the statute was the Fourteenth Amendment, which authorizes Congress to "enforce" the Fourteenth Amendment with "appropriate" legislation. U.S. Const. amend XIV, § 5. The Fourteenth Amendment includes the Due Process Clause, which incorporates the protections of the First Amendment, including the Free Exercise Clause. *Boerne*, 521 U.S. at 519. But the Supreme Court had previously held that neutral, generally applicable laws do not violate the Free Exercise Clause, regardless of the burden they impose on free exercise. *Employment Division v. Smith*, 494 U.S. 872 (1990). The Court concluded in *Boerne* that RFRA went far beyond

enforcement of the Fourteenth Amendment because the burdens on states imposed by the statute were not "congruent" and "proportional" to the evidence of past constitutional violations by state actors. 521 U.S. at 532. In other words, RFRA could not be justified as an appropriate exercise of congressional authority under the Fourteenth Amendment because "[t]he substantial costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional general regulatory power, far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause." *Id.* at 534.

As the court will explain below, the foundation's reliance on *Shelby* and *Boerne* is misplaced for two reasons: (1) both cases are about unconstitutional burdens on states, not unconstitutional exemptions; and (2) the reasoning of *Shelby* and *Boerne* do not apply to the NVRA.

## 1. Burdens versus exemptions

The fundamental problem with the foundation's constitutional challenge is not the identity of the litigant but rather the nature of the claim. *Shelby* and *Boerne* are about constitutional limitations on Congress's ability to encroach on a state's sovereignty. But the foundation is not asking this court to *remove* a burden that Congress has imposed on Wisconsin. Rather, the foundation is asking the court to *impose* a burden that Congress removed. This is inconsistent with both *Shelby* and *Boerne*.

The parties who challenged the constitutionality of the statutes at issue in *Shelby* and *Boerne* were both complaining about federal requirements imposed on states. Likewise, the Supreme Court's discussion of federalism issues in *Shelby* and *Boerne* was about unwarranted intrusion by the federal government into areas of traditional state concern. In both cases, the

Court concluded that the burden was unjustified. In this case, the foundation seeks to turn *Shelby* and *Boerne* on their head by using them, not to remove a burden, but to *expand* the scope of a statute and impose *additional* burdens on a state by requiring Wisconsin to comply with the NVRA.

It is true, as the foundation observes, that the Supreme Court stated in *Shelby* that "all States enjoy equal sovereignty" and that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." 570 U.S. at 535, 542. But those statements were in the context of the Court's concern that the preclearance provision's "current burdens" were not justified by "current needs." *See id.* at 542. The problem was that Congress was regulating some states too much, not too little. *See id.* at 544–45. Under the foundation's view of the law, the proper remedy in *Shelby* would have been to subject *all* states to preclearance so that all states were equally burdened. But the Court did not suggest that expanding the preclearance provision would be appropriate, only that burdens imposed on the covered states were not justified.

The foundation's reliance on *Boerne* is also misplaced. That case had nothing to do with unequal treatment among the states. The reference to "congruence and proportionality" was about the relationship between the burden imposed on the states with the states' history of unconstitutional conduct.

Providing a state with an exemption to an otherwise generally applicable rule does not intrude on that state's sovereignty, so there is no federalism concern. If there is a claim that the NVRA violates federalism principles, that claim would not be about the exemption provided to Wisconsin and several other states; it would be about the requirements imposed

13

on all the other states. Such a claim would almost certainly fail: the court of appeals has already held that the NVRA is a valid exercise of Congress's authority under the Elections Clause. *ACORN*, 56 F.3d at 793–95. Regardless, that is not the foundation's claim. If it were, the claim would be self-defeating: it would result in striking down the statute that is the basis for the foundation's requested relief.

The foundation cites no case in which the Supreme Court or any other court invalidated a state exemption because it violated federalism principles. The foundation cites *Heckler v. Mathews*, 465 U.S. 728 (1984), and *Ohio v. EPA*, 98 F.4th 288 (D.C. Cir. 2024), to support its theory, but neither case is instructive. *Heckler* involved an equal protection challenge to a government benefit that applied differently to men and women. The plaintiff was a man who was denied benefits under the statute. The defendant argued that the plaintiff lacked standing because the statute contained a severability clause stating that the benefit would be withdrawn for both men and women if the benefit for women were held invalid, so the plaintiff's injury could not be redressed even if he won. The Court rejected this argument, concluding that the relevant injury in the context of an equal protection claim is unequal treatment, and that injury could be redressed by eliminating the benefit for the favored class *or* extending the benefit to the disfavored class. *Heckler*, 465 U.S. at 740.

The foundation contends that *Heckler* shows that discriminatory treatment can be remedied by "leveling up" the disfavored party *or* by "leveling down" the favored party, and this court could remedy the alleged "equal sovereignty" violation by requiring all states to comply with the NVRA. But *Heckler* differs from this case in two related and important respects. First, the issue in *Heckler* was about standing. In this case, the foundation is not contending that it has standing because it was denied equal treatment. Rather, this court has already

14

determined that the foundation's injury is the denial of information and that the injury is redressable because the court could order the administrator to produce that information if the foundation were to succeed on the merits. A case addressing a different theory of standing is not instructive.

Second, the foundation is not asserting a claim under the Equal Protection Clause. As the Court explained in *Heckler*, the injury for an equal protection claim is the discriminatory treatment itself. For that reason, it does not matter whether the discrimination is remedied by granting a benefit to a disfavored class or removing a benefit from a favored class. In the context of a claim under the Tenth Amendment or other principle of federalism, the injury is the intrusion on state sovereignty. That injury cannot be remedied by *extending* an intrusion on state sovereignty. In *Shelby*, the fact that the intrusion was imposed only on a small set of states added insult to injury. But the Court did not hold or imply that the injury could be remedied by imposing the preclearance provision on all states. Even in *Heckler*, the question was whether the Court could withdraw a government benefit from a class of people to remedy unequal treatment; the foundation identifies no case in which a court imposed a new burden to remedy a constitutional violation.

*Ohio v. EPA* did involve an "equal sovereignty" claim. The plaintiffs were states that contended that a waiver the EPA granted to California for certain requirements under the Clear Air Act harmed them in various ways, including that the EPA was giving California preferential treatment in violation of *Shelby*'s "equal sovereignty" principle. The court concluded that the disfavored states had standing to sue under that theory, and the court relied in part on *Heckler* to support that conclusion, but the court then concluded that the claim failed on the merits. *Ohio*, 98 F.4th at 307–09.

15

The court in *Ohio* did not consider the fundamental difference between a claim under the Equal Protection Clause and a federalism claim, which limits any persuasive value it may have. Regardless, the case is distinguishable. Again, the only issue *Ohio* decided in the plaintiffs' favor was standing, and this court has resolved that issue in the foundation's favor as well. Further, the plaintiffs in *Ohio* were disfavored states challenging California's preferential treatment, so their situation was more similar to *Heckler.*

Neither *Heckler* nor *Ohio* supports a decision in the foundation's favor. The court concludes that the foundation has failed to state a claim upon which relief may be granted because Congress did not violate the Tenth Amendment or any other principle of federalism by making Wisconsin and several other states exempt from the NVRA.

### 2. Applicability of *Shelby* and *Boerne* to the NVRA

Even if *Shelby* or *Boerne* could be read to support a claim that an exemption could violate the Tenth Amendment or federalism principles, the foundation's constitutional challenge still fails under both cases. As for *Shelby*, there are multiple reasons why the Supreme Court's discussion about "equal sovereignty" does not suggest that the NVRA exemption is invalid.

As an initial matter, the Court did not hold that the principle of "equal sovereignty" is an independent basis for striking down a statute under any circumstance. The Court stated that the principle was "highly pertinent" when "assessing" the "disparate treatment" of states. 570 U.S. at 544. But the Court provided no test or metric for holding that a statute was invalid as a violation of "equal sovereignty." Rather, the Court acknowledged that it had previously "rejected the notion that the principle operated as a bar on differential treatment outside th[e] context" of a state's admission into the union, and the Court did not overrule that holding. *Id.*

But even if the principle of "equal sovereignty" could provide a basis for declaring a federal statute unconstitutional, there are three reasons why the NVRA is not such a statute. First, *Shelby* addressed the limits of congressional authority under the Fifteenth Amendment, which is limited to "enforcement" of the amendment's prohibition on racial discrimination in voting. In other words, the Fifteenth Amendment does not give Congress authority to impose any requirements or restrictions it wishes to protect voting rights. Rather, Congress must show that past racial discrimination by the states justifies the burdens imposed on the states by the federal statutes. *Shelby*, 570 at 553; *Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009). The limited nature of Congress's power under the Fifteenth Amendment was a key part of the Court's analysis in *Shelby*. *See Ohio*, 98 F.4th at 309.

In contrast, Congress enacted the NVRA under the Elections Clause, as recognized by both the Supreme Court and the court of appeals. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9 (2013); *ACORN*, 56 F.3d at 793–94. The Elections Clause is fundamentally different from the Fifteenth Amendment because the Elections Clause gives Congress plenary authority over the time, place, and manner of voting—including voting registration—in federal elections. *ACORN*, 56 F.3d at 795 ("The Elections Clause confers on Congress a general supervisory power, under which it may supplement state regulations or may substitute its own.") (internal quotation marks, citations, and alterations removed). The Elections Clause expressly contemplates that Congress may direct the states how to run their federal elections: "Congress can . . . regulate federal elections and force the state to bear the expense of the regulation." *Id.* at 794. So any federalism concerns are necessarily diminished when Congress acts pursuant to the Elections Clause. *See Inter Tribal Council,* 570 U.S. at 13–

15. Encroachment on state sovereignty is part of the design of the Elections Clause, not an unfortunate side effect to be cabined and scrutinized. *See ACORN*, 56 F.3d at 795.

Second, the Court in *Shelby* repeatedly emphasized that the Voting Rights Act was extraordinary, if not unique, in how far it departed from federalism norms and intruded into state sovereignty. *See Ohio*, 98 F.4th at 309–10. The statute suspended "all changes to state election law—however innocuous" until the federal government approved them, requiring states to "beseech the Federal Government for permission to implement laws that they would otherwise have the right to enact and execute on their own." *Shelby*, 570 U.S. at 544. This was a "federal intrusion into sensitive areas of state and local policymaking, and represent[ed] an extraordinary departure from the traditional course of relations between the States and the Federal Government." *Id.* at 545.[4]

The NVRA is nothing like the preclearance provision. The NVRA does not usurp broad areas of state authority or impose federal supervision on the legislative process. Rather, the requirements in the NVRA are simply about expanding methods of voter registration and maintaining accurate registration lists. The provision at issue in this case is about making certain records available to the public. These modest requirements bear no resemblance to the "extraordinary" intrusion at issue at in *Shelby*.

Third, the preclearance provision "singled out" states in "a fundamental way," *id.* at 553, 556, in that the list of covered states was "'reverse-engineered': Congress identified the

---

[4] *See also Shelby*, 570 U.S. at 544 ("The Voting Rights Act sharply departs from . . . basic [federalism] principles."); *id.* at 545 (preclearance provision is "stringent," "potent," and "an uncommon exercise of congressional power"); *id.* ("the Act constitutes extraordinary legislation otherwise unfamiliar to our federal system"); *id.* at 549 (preclearance provision is "extraordinary and unprecedented"); *id.* at 555 ("Multiple decisions . . . have reaffirmed the Act's extraordinary nature.").

jurisdictions to be covered and then came up with criteria to describe them." *Id.* at 551. Any state on that list was assumed to be engaging in racial discrimination until it could prove otherwise, which was an afront to the state's "dignity." *See id.* at 544. In this case, the difference in treatment was the direct result of the state's own choices. Any state that either did not require voter registration or allowed registration at the polls could receive an exemption from the NVRA, based on a belief that more liberal registration requirements alleviated the need for the types of regulations included in the NVRA. *See* S. Rep. No. 103-6 (1993); H.R. Rep. 103-9 (1993). There was no singling out. The states had notice of exactly what they needed to do to avoid federal regulation.

*Shelby* was a unique case involving an unusual statute that invaded traditional state functions and stigmatized a small set of states. Throughout its opinion, the Supreme Court emphasized how extraordinary the circumstances were in that case. The Court did not purport to be setting out a broadly applicable standard that is triggered any time a federal law does not treat states identically.

Other courts share this view and have declined to extend *Shelby*'s "equal sovereignty" analysis to new situations. The court has already discussed *Ohio v. EPA*, which relied on the reasons discussed above to reject a challenge to a statute that waived certain requirements of the Clean Air Act if a state met certain conditions. 98 F.4th at 306–14.

In *Mayhew v. Burwell*, Maine challenged a statute that required states to freeze their Medicaid eligibility standards for approximately ten years. 772 F.3d 80 (1st Cir. 2014). Maine contended that the statute violated "equal sovereignty" because it resulted in different requirements being imposed on different states. The court concluded that *Shelby* was distinguishable because the Medicaid statute did not single out states the way that *Shelby* did,

19

and it did not involve a federal intrusion into "a sensitive area of state or local policymaking." *Id.* at 93.

In *National Collegiate Athletic Ass'n v. Governor of New Jersey*, the plaintiff challenged a federal statute that prohibited sports gambling in all states except Nevada. 730 F.3d 208 (3d Cir. 2013). The court concluded that *Shelby* was not controlling for multiple reasons, including that the gambling statute was authorized under Commerce Clause rather than the Fifteenth Amendment, and it did not intrude on "sensitive areas of state and local policymaking" like the preclearance provision did. *Id.* at 238–39.

In *In re Border Infrastructure Environmental Litigation*, the court rejected a challenge to a federal law that preempted state environmental regulations on certain construction projects near the U.S. border. 284 F. Supp. 3d 1092, 1102 (S.D. Cal. 2018). California contended that the federal statute interfered with its ability to enforce its own laws, and it violated "equal sovereignty" because it applied only to border states. But the court concluded that *Shelby* was not on point because the federal government has broad authority on issues related to border security and immigration, and the federal law did not "single out a particular state in imposing requirements on state powers in a discriminatory manner as the VRA in *Shelby*." *Id.* at 1145.

The foundation cites no cases in which any court relied on the "equal sovereignty" principle from *Shelby* to invalidate a statute or other government action. Even if that principle could apply in new contexts, this is not one of them, for the reasons discussed.

*Boerne* also provides no support for the foundation's claim. As already discussed, *Boerne* was about the scope of Congress's power under the Fourteenth Amendment. It did not address Congress's power under the Elections Clause, it was not about a statute that applied differently

to different states, and it did not discuss the concept of "equal sovereignty." So it has no bearing on this case.

The foundation cites *Condon v. Reno*, 913 F. Supp. 946, 962 (D.S.C. 1995), for the proposition that Congress relied on the Fourteenth Amendment to enact the NVRA, but even if that is correct, it does not matter. The court of appeals has already held that the NVRA was a valid exercise of Congress's authority under the Elections Clause. *ACORN*, 56 F.3d at 793–94. Even if the foundation is correct that the NVRA does not satisfy *Boerne*'s test for laws enacted under the Fourteenth Amendment, a statute does not need to be supported by more than one congressional power. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 561, 574–75 (2012) (concluding that Affordable Care Act was a not a valid exercise of the commerce power, but it was a valid exercise of the taxing power).

The bottom line is that the foundation's claim is based on a fundamental misunderstanding of the case law it relies on. Neither *Shelby* nor *Boerne* provide any support for the view that Wisconsin's exemption under the NVRA is unconstitutional. The foundation's claim under the NVRA rests on a view that Wisconsin is not exempt, so its claim fails as a matter of law. The foundation cannot fix that basic defect by amending its complaint, so the court will dismiss the complaint with prejudice and direct the clerk of court to enter judgment.

ORDER

IT IS ORDERED that the motion to dismiss filed by Meagan Wolfe, Dkt. 14, is GRANTED, and this case is DISMISSED with prejudice. The clerk of court is directed to enter judgment in favor of Wolfe and close this case.

Entered November 26, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge